# In the United States Court of Federal Claims

No. 13-37
Filed under seal: March 27, 2013[*]
Reissued for publication: April 4, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | * Bid protest; |
| COHEN FINANCIAL SERVICES, Inc., | * FDIC Acquisition Policy Manual ¶ 3.210(c) |
| | * (price evaluation); |
| Plaintiff, | * FDIC Acquisition Procedures, Guidance, |
| | * and Information |
| v. | * 3.206(a)(2) (required price analysis in |
| | * best value procurements); |
| THE UNITED STATES, | * 3.210(c)(2) (price realism); |
| | * 3.214 (documentation of source |
| Defendant, | * selection); |
| | * 5 U.S.C. § 706(2)(A) (review under the |
| and | * Administrative Procedure Act); |
| | * 28 U.S.C. § 1491(b)(4) (review of bid |
| MIR MITCHELL & COMPANY, LLP, | * protests). |
| | * |
| Defendant-Intervenor. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Jason A. Carey, Luke W. Meier**, McKenna Long & Aldridge, Washington, D.C., Counsel for Plaintiff.

**Corinne A. Niosi**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Scott McCaleb**, Wiley Rein, LLP, Washington, D.C., Counsel for Intervenor-Defendant.

### MEMORANDUM OPINION AND ORDER

**BRADEN**. *Judge*.

---

[*] On March 27, 2013, the court asked the parties to suggest deletions from the public version of any confidential and/or privileged information, and to note any citation or editorial errors requiring correction. The court received one correction and incorporated it in footnote 2.

## I.      RELEVANT FACTUAL BACKGROUND.[1]

### A.      The Solicitation.

On July 2, 2012, the Federal Deposit Insurance Corporation ("FDIC") issued Solicitation No. RECVR-12-R-0088 ("Solicitation").  AR Tab 5 at 28-150.  The purpose of the Solicitation was to provide business operations support services for the FDIC's Division of Resolutions and Receiverships.  AR Tab 5 at 37.  To provide those services, the Solicitation required that a core group of contract workers be available in six functional areas—cash management, financial processing, general accounting, tax, securities accounting, and global functions—plus the capability to expand the number of workers quickly in the event of an increased workload.  AR Tab 5 at 37, 40.  Staffing levels could be as low as ten workers and as high as 131.  AR Tab 5 at 31, 42.  The period of performance was to run from the signing of the contract through December 31, 2014, but the FDIC had the option to extend the performance period for four additional one-year periods.  AR Tab 5 at 38.

The Solicitation required each offeror to propose a single hourly pay rate for six pay grades:  project manager, team lead, senior professional, professional, technician, and administration.  AR Tab 5 at 31-32.  Although there were only those six pay grades, the Solicitation required a workforce able to deliver services in seventeen specializations.  AR Tab 5 at 39.  Offerors were required to "demonstrate that proposed key personnel possess the necessary experience and qualifications."  AR Tab 5 at 143.

The Agency was required to award the contract based on best value, considering three elements, in descending order of importance:  Mission Capability, Past Performance, and Price.  AR Tab 5 at 146.  Although Price was listed third in order of importance, "[t]he degree of importance of price as a factor . . . could increase depending upon how equally matched the competing proposals are for the other factors evaluated.  When competing proposals are judged to be equal upon evaluation of the other factors considered in the best value analysis, total price and other price factors would become the most significant factor."  AR Tab 5 at 146.  The price proposals were to be "evaluated with respect to completeness, reasonableness, and realism."  AR Tab 5 at 149.  Under realism, the Solicitation stated, "Labor rates that do not reflect a reasonable compensation for the skill required in a labor category will be considered unrealistic."  AR Tab 5 at 150.

### B.      The Proposals.

Eight offerors, including Cohen Financial Services, Inc. ("Cohen" or "Plaintiff") and defendant-intervenor Mir Mitchell & Company, LLP ("MMC" or "Intervenor"), submitted proposals in response to the Solicitation.  AR Tab 9 at 812.  The two proposals at issue here are those of Cohen and MMC.

---

[1] The relevant facts were derived from the January 25, 2013 Administrative Record, as supplemented on February 4 and 13, 2013 ("AR Tab 1-69 at 1-2922").

Cohen submitted a timely proposal.  AR Tab 7 at 153-612 (undated proposal); AR Tab 9 at 812 (FDIC abstract showing Cohen's submission was on time).  The members of the FDIC's Technical Evaluation Panel ("Panel") rated Cohen's proposal as follows:

| | ███ | ███ | ███ | Maximum points available |
|---|---|---|---|---|
| Mission Capability | | | | |
|   Technical approach | ███ | ███ | ███ | 40 |
|   Management plan | | | | 45 |
|   Key personnel | | | | 15 |
|   Total* | ███ | | ███ | 100 |
| Past Performance | | | | |
| Oral Presentation | | | | |
|   Management plan overview | (no subtotal) | ███ | ███ | 25 |
|   Transition plan overview | (no subtotal) | ███ | ███ | 15 |
|   Capability to provide contractor support in Dallas and D.C. | (no subtotal) | ███ | ███ | 15 |
|   Key personnel and maintenance of core competence | (no subtotal) | ███ | ███ | 25 |
|   Past experience supporting the banking industry/failed financial institutions | (no subtotal) | ███ | ███ | 20 |
|   Total* | ███ | ███ | ███ | 100 |

* The evaluation form contained a line labeled "CONSENSUS" but no line labeled "Total," so that the format of the evaluations was not consistent.  For example, ████'s Mission Capability subtotals added up to ████; she listed ████ on the "CONSENSUS" line.  As to Oral Presentation, ████ wrote ████ on the CONSENSUS line, but noted and circled her total of ████ elsewhere on the page.  ████ wrote ████ on the CONSENSUS line and also "MY SCORE ████" elsewhere on the sheet; ████'s total was ████, on the CONSENSUS line.

AR Tab 11 at 838-94.

On July 31, 2012, MMC also timely submitted a proposal.  AR Tab 8 at 613-811 (proposal); AR Tab 9 at 812 (FDIC abstract showing MMC's submission was on time).  The Panel rated MMC's proposal as follows:

| | █████ | █████ | █████ | Maximum points available |
|---|---|---|---|---|
| Mission Capability | | | | |
|   Technical approach | ███ | ███ | ███ | 40 |
|   Management plan | | | | 45 |
|   Key personnel | | | | 15 |
|   Total* | | | | 100 |
| Past Performance | | | | |
| Oral Presentation | | | | |
|   Management plan overview | (no subtotal) | ███ | ███ | 25 |
|   Transition plan overview | (no subtotal) | | | 15 |
|   Capability to provide contractor support in Dallas and D.C. | (no subtotal) | (no subtotal) | | 15 |
|   Key personnel and maintenance of core competence | (no subtotal) | (no subtotal) | ███ | 25 |
|   Past experience supporting the banking industry/failed financial institutions | (no subtotal) | (no subtotal) | ███ | 20 |
|   Total* | | ███ | ███ | 100 |

* Again, the evaluation form contained a line labeled "CONSENSUS," but no line labeled "Total," so that the format of evaluations was not consistent.  For Oral Presentation, █████ listed █████, presumably his total; █████ listed █████ on the CONSENSUS line, but circled her total, █████, elsewhere on the page.  █████ listed █████ on the CONSENSUS line.

AR Tab 12 at 895-958.

After the Panel members completed individual ratings, they held a "meeting and determined a consensus rating for each Offeror's technical proposal."  AR 27 at 1411.  Those consensus ratings and the initial prices were as follows:

| Offeror | Score | Past Performance | Initial Price | Minority Status |
|---|---|---|---|---|
| MMC | 75 | Very Good/Significant Confidence | ███ | ███ |
| Cohen | 80 | Very Good/Significant Confidence | ███ | ███ |
| ███ | 80 | Very Good/Significant Confidence | ███ | ███ |
| | 85 | Excellent/High Confidence | ███ | |
| | 70 | Satisfactory/Confidence | ███ | ███ |
| | 70 | Satisfactory/Confidence | ███ | |
| | 60 | Neutral/Neutral | ███ | |
| | 45 | Moderate/Low Confidence | ███ | ███ |

AR 27 at 1412.

4

Then, the Contracting Officer ("CO") determined that the proposals of MMC, Cohen, ▮▮▮▮ were within the competitive range and held discussions with each of those offerors.  AR Tab 27 at 1419.

On September 4, 2012, the FDIC sent MMC and Cohen requests for best and final offers ("BAFO").  AR Tab 13 at 959-60; AR Tab 14 at 961-62.  The letter to MMC listed the following areas "that may benefit from improvement": ▮▮▮▮  AR Tab 14 at 962.  On September 5, 2012, Cohen sent the FDIC an email requesting clarification.  AR Tab 16 at 966.  On September 6, 2012, the FDIC responded that it "Need[ed] more information re: ▮▮▮▮"  AR Tab 17 at 968.

On September 11, 2012, MMC submitted its BAFO.  AR Tab 18 at 971-1053.  Cohen also submitted its BAFO.  AR Tab 19 at 1054-1330 (undated).  On September 13, 2012, Cohen and MMC were invited to make oral presentations.  AR Tab 20 at 1331; AR Tab 21 at 1332.

On October 10, 2012, the Panel issued a report, concluding that MMC represented "the overall Best Value for the FDIC" and recommending that the contract be awarded to MMC.  AR Tab 27 at 1408-23.  The Panel summarized the selection data as follows:

| Offeror | BAFO Technical Score | Oral Technical Score | Total Technical Score | BAFO Price |
|---------|---------------------|---------------------|----------------------|------------|
| MMC | 75 | 88 | 163 | $11,496,293 |
| Cohen | 80 | 88 | 168 | |
| ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |

AR 27 at 1422.

The Panel further explained that "the three competing proposals were determined to be generally equal when comparing actual Mission Capability scores when combined for the Technical Evaluation and the Oral Presentation as well as the Past Performance factors."  AR Tab 27 at 1423.  "[T]he types of services being offered by these companies did not warrant the higher costs proposed by [Cohen] or by ▮▮▮▮."  AR Tab 27 at 1423.

On November 8, 2012, the FDIC finalized its Selection Recommendation Report and approved awarding the Receivership Basic Ordering Agreement for Business Operations Support Services to MMC.  AR Tab 31 at 1443.  On November 28, 2012, the FDIC awarded MMC a contract, effective January 1, 2013.  AR Tab 32 at 1447.

On December 7, 2012, the CO responded to Cohen's request for a debriefing with a letter stating, "▮▮▮▮"  AR Tab 41 at 1782.  On December 12, 2012, Cohen filed a protest with the FDIC.  AR Tab 34 at 1560-1769.  On December 13, 2012, Cohen submitted a correction to its December 12, 2012 protest.  AR Tab 35 at 1770.  Cohen based its protest on the FDIC's failure to notify it of "any deficiencies in its proposal relating to price."  AR Tab 34 at 1561.  On December 27, 2012, the FDIC denied Cohen's protest, because at the time it held discussions with the offerors, the FDIC was concerned only about whether the prices were within the competitive range—and Cohen's price was within that range.  AR Tab 37 at 1774-77.

## II.    PROCEDURAL HISTORY.

On January 15, 2013, Cohen filed a post-award bid protest Complaint ("Compl.") in the United States Court of Federal Claims, alleging that the FDIC violated section 3.210(c)(2) of its Acquisition Procedures, Guidance, and Information ("PGI") and the terms of the Solicitation by failing to perform a reasonable price realism analysis of MMC's proposal.  Compl. ¶¶ 93-101. The January 15, 2013 Complaint also alleges that the FDIC improperly relied on MMC's misrepresentations about the key personnel that MMC intended to hire.  Compl. ¶¶ 102-113.

On the same day, Cohen also filed a Motion For Temporary Restraining Order And Preliminary Injunction, a Motion For Leave To File Under Seal, and a Motion For A Protective Order.  On January 16, 2013, the court held a telephone conference to consider Cohen's motions. Pursuant to that telephone conference, on January 17, 2013, Cohen's Motion For A Protective Order was granted, and the FDIC voluntarily issued a stop work order of up to ninety days, pending resolution of this case.  AR Tab 39 at 1779.  On January 18, 2013, the FDIC modified its contract with Cohen to rescind the January 31, 2013 Termination for Convenience to set a new expiration date on April 13, 2013.  AR Tab 40 at 1781.

On January 18, 2013, MMC filed an Unopposed Motion To Intervene, that the court granted on January 22, 2013.

On January 25, 2013, the Government filed an Unopposed Motion For Leave To File The Administrative Record On DVD, that the court granted on the same day.

On February 4, 2013, the Government filed a Motion For Leave To Correct The Administrative Record ("2/4/13 Gov't Mot. Supp.").[2]  On February 5, 2013, Cohen requested a status conference regarding the Administrative Record.  On February 6, 2013, the court granted Cohen's Motion and held a telephone status conference.  On February 13, 2013, the Government filed a Second Motion For Leave To Correct The Administrative Record ("2/13/13 Gov't Mot. Supp.").[3]

---

[2]  The Government's February 4, 2013 Motion requested to supplement the Administrative Record with: technical and price proposals from offerors, other than Cohen and MMC; the FDIC evaluations and Panel evaluation sheets; post-BAFO Panel evaluations of all proposals; the FDIC's communications with offerors; past performance questionnaires for Cohen and MMC; three pages omitted from the evaluation worksheets in the Administrative Record; and more legible copies of pages already in the Administrative Record.  MMC objected to the inclusion of: the technical proposals of offerors other than MMC and Cohen; material pertaining to the FDIC's evaluation of those proposals; and past performance questionnaires for Cohen and MMC.  2/4/13 Gov't Mot. Supp. at 1-3 & n.2.  Since all of the documents at issue fall within the list of Administrative Record "core documents relevant to a protest case," the court has determined that it must grant the Government's February 4, 2013 Motion.  *See* RCFC App. C ¶ 22.

[3]  The Government's February 13, 2013 Motion requested to supplement the Administrative Record with emails pertaining to the procurement that were exchanged between the CO and potential offerors.  2/13/13 Gov't Mot. Supp. at 2.  Again, since these emails are

On February 8, 2013, Cohen filed a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR") and a First Amended Complaint ("Am. Compl.") that alleged that the FDIC: failed to perform and document price realism analysis, as required by its regulations and the Solicitation; acted arbitrarily and capriciously in its erroneous evaluation of MMC's mission capability; and violated its regulations by relaxing the minimum requirements set forth in the Solicitation.  On February 22, 2013, the Government filed a Cross-Motion For Judgment Upon The Administrative Record And Response ("Gov't Mot. JAR").  On the same day, MMC filed a Cross Motion For Judgment On The Administrative Record ("Int. Mot. JAR").  On March 5, 2013, Cohen filed a Reply ("Pl. Reply").  On March 15, 2013, the Government filed a Reply ("Gov't Reply") and MMC filed a Reply ("Int. Reply").

## III.   DISCUSSION.

### A.   Jurisdiction.

The February 8, 2013 post-award bid protest First Amended Complaint alleges that the November 28, 2012 award to MMC violated FDIC Acquisition Policy Manual ("APM") ¶ 3.210(c) and PGI §§ 3.210(c)(2), 3.214(a)(2), because the FDIC failed to evaluate price realism and document that analysis in a written report.  Am. Compl. ¶¶ 117-24.  The February 8, 2013 Amended Complaint also alleges that the FDIC acted without a rational basis when it failed to downgrade MMC's proposal that relied on unqualified and geographically unavailable personnel.  Am. Compl. ¶¶ 125-34.  The February 8, 2013 Amended Complaint further alleges that in awarding MMC a contract, despite the presence of three unqualified members on MMC's proposed management team, the FDIC improperly relaxed the Solicitation's requirements.  Am. Compl. ¶¶ 135-39.  The February 8, 2013 Amended Complaint also seeks a permanent injunction requiring the FDIC to set aside the November 28, 2012 award of a business operations support contract to MMC.  Am. Compl. at 27.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (2006).

Accordingly, 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the February 8, 2013 Amended Complaint.

### B.   Standing.

---

"core documents relevant to a protest case," the court has determined it must grant the Government's February 13, 2013 Motion.  RCFC App. C ¶ 22(i).

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the Competition in Contracting Act of 1984, 31 U.S.C. § 3551(2)(A) ("CICA"). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)). A two-part test is applied to determine whether a protester is an "interested party," a protester must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

Cohen was one of the three offerors that met the best value requirements of the Solicitation and was selected to make an oral presentation. AR Tab 31 at 1441. In addition, Cohen received the highest technical evaluation of the three offerors asked to submit oral presentations, and Cohen's price was lower than that of the other unsuccessful offeror. AR Tab 31 at 1441. Therefore, Cohen is an "interested party."

A second standing requirement that the protestor must satisfy is that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Prejudice is demonstrated where the protestor "can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. A proper standing inquiry, however, should not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

If, as Cohen asserts, a proper price realism analysis and fidelity to the Solicitation's personnel qualification requirements would have led the FDIC to reject MMC's proposal, Cohen would have had a substantial chance of securing the contract. AR Tab 31 at 1441 (showing that Cohen received the highest evaluation of the three offerors asked to submit oral presentations, plus a lower price than the other unsuccessful offeror). Therefore, the court has determined that Cohen has standing to contest the award of the contract at issue in this case.

## C.     Standard Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4)

("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze the required showings for injunctive relief under APA standards.

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged, based on a regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

If an award decision is challenged as arbitrary, capricious or lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis").

Moreover, the court may set aside a procurement "only in extremely limited circumstances." *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks and citations omitted).

The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum v. United States*, 404 F.3d 1346, 1353-54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

**D.      Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.**

**1.      Whether The Agency's Evaluation Of Defendant-Intervenor's Mission Capability Was Based On Critical And Objective Errors.**

**a.      The Experience And Qualifications Of Key Personnel.**

**i.      The Plaintiff's Argument.**

Cohen asserts that the FDIC made a critical and objective error in awarding MMC a strength based on a finding that the "[e]xperience and backgrounds" of the proposed MMC management team mirrors "industry experience required in the [Statement of Work]." Pl. Mot. JAR at 33 (quoting AR Tab 27 at 1412). Cohen argues that the Solicitation listed position-specific qualifications for key personnel and that three of the █████ members of MMC's proposed management team failed to meet those minimum requirements. Pl. Mot. JAR at 33. The █████ Lead lacked the minimum five years' experience working with █████ in a financial processing or accounting operations environment, AR Tab 18 at 1044, both █████ Leads lacked the required █████, AR Tab 18 at 1046, 1049. Had the FDIC properly evaluated the qualifications of MMC's management team and the location of MMC's staff, MMC would have received "a much lower Mission Capability score, and likely found MMC's proposal deficient for proposing unqualified personnel." Pl. Mot. JAR at 33-34. As a result, Cohen would have had a substantially increased advantage in the most important technical factor and would have received the contract award as the best value offeror. Pl. Mot. JAR at 33-34.

**ii.      The Government's Response.**

The Government responds that the Solicitation "did not require offerors to propose key personnel for a 'position.'" Gov't Mot. JAR at 34. Offerors were required "to submit resumes to demonstrate only that the key personnel had expertise in 'each of the six functional areas' described in the [Solicitation.]" Gov't Mot. JAR at 34 (quoting AR Tab 5 at 141). The Solicitation allowed offerors to identify "key personnel with 'similar experience' to that called for in the [Solicitation]." Gov't Mot. JAR at 34 (quoting AR Tab 5 at 141). The Government concedes that personnel who do not meet the requirements for a position listed in the Solicitation "cannot be assigned to that position[.]" Gov't Mot. JAR at 35 (citing AR Tab 5 at 71). But the Government argues that the Solicitation's requirements for including personnel in a proposal are less stringent. Gov't Mot. JAR at 34. In fact, Cohen's proposal listed key personnel who "did not meet the minimum requirements for the position that Cohen identified they would fill." Gov't Mot. JAR at 35 (citing AR Tab 19 at 1203, 1212 (showing that █████ of Cohen's proposed █████ did not have the required █████ experience); AR Tab 19 at 1206-07 (demonstrating that Cohen's proposed █████ did not have the required education, but the FDIC waived that requirement on 10/11/2011); AR Tab 19 at 1221 (demonstrating that Cohen's proposed █████ lacked the required █████ experience in banking or related industry); AR Tab 19 at 1236-37 (showing that Cohen's proposed █████ did not have the required █████ experience)).

10

### iii.        The Intervenor-Defendant's Response.

MMC responds that Cohen "fundamentally misconstrue[s]" the Solicitation's personnel qualification requirements.  Int. Mot. JAR at 22.  "[T]he Solicitation did not require proposed key personnel to meet specific requirements, in general, nor did the Solicitation require key personnel to meet the specific '█████' qualifications in the ████ or ████ functional areas." Int. Mot. JAR at 22.  MMC's "proposed key personnel had sufficient depth of experience that was similar to the [Statement of Work's] functional areas, and therefore the strength that evaluators assigned was consistent with the Solicitation's instructions and evaluation scheme." Int. Mot. JAR at 22.  Therefore, Cohen cannot establish "prejudice sufficient to sustain its protest or justify injunctive relief," because "as many as ████ of [Cohen's] proposed key personnel ████ did not meet the labor category descriptions outlined in the [Statement of Work.]"  Int. Mot. JAR at 22-23.

### iv.        The Court's Resolution.

Interpretation of the Solicitation is a question of law and it "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."  *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004); *see also Banknote,* 365 F.3d at 1353 (stating that interpretation of a solicitation is a question of law)**.**  In this case, one part of the solicitation states that: "The offeror must identify and demonstrate that proposed key personnel possess the necessary experience and qualifications."  AR Tab 5 at 143.  Another part states: "[The Key Personnel] Subfactor is met when the Offeror has identified and demonstrated that it possesses the specified experience and qualifications through the depth of its resources, including Key Personnel with similar experience."  AR Tab 5 at 141.  Cohen's reading of the Solicitation is consistent with the first sentence, but not the second.  If the proposed key personnel must satisfy every experience and qualification requirement in a formalistic way, then the second sentence would have required key personnel to have "the specified experience" rather than "similar experience."  The court therefore reads the Solicitation as not requiring a perfect match between the individual position requirements in the Solicitation and the experience of the offerors' proposed key personnel.

This interpretation is consistent with the doctrine that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."  *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,* 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d 972, 975 (Ct. Cl. 1965)); *see also Banknote,* 365 F.3d at 1353 n.4 (stating that the principles for interpreting contracts apply equally to interpreting solicitations). MMC and Cohen could each be described as a "reasonably intelligent person acquainted with the contemporaneous circumstances," and they each proposed personnel consistent with an understanding that the Solicitation required proposed key personnel to have "similar experience" to the Solicitation's position requirements.  MMC filled twenty pages of its proposal with tables evidencing how its key personnel complied with the Solicitation's position-specific requirements, as well as where those personnel failed to satisfy the position-specific requirements.  AR Tab 18 at 1031-50.  MMC also provided details to show that its personnel had similar experience to the experience required.  AR Tab 18 at 1044 ("████ does not meet the

five year requirement; however, he has ▮▮▮▮ for the FDIC on approximately ▮▮▮▮ separate bank closings."); AR Tab 18 at 1046 ("▮▮▮▮ does not have the ▮▮▮▮; however, he was a Director and Manager of the finance department for ▮▮▮▮ for approximately ▮▮▮▮ years. As a result, he oversaw very large projects all over the globe for the company."); AR Tab 18 at 1049 ("▮▮▮▮ does not have a ▮▮▮▮; however, he has held senior management positions and was the team leader for ▮▮▮▮ at the FDIC offices in Dallas."). Similarly, where one of Cohen's proposed key personnel failed to meet a position-specific requirement, Cohen explained that she had similar experience. AR Tab 19 at 1206-07 ("Education requirement waived due to relevant performance by Oversight Management on 10/11/2011."). In addition, another of Cohen's key personnel listed only ▮▮▮▮ years of experience instead of the ▮▮▮▮ required for a ▮▮▮▮ or ▮▮▮▮ of specialized experience required of a ▮▮▮▮, but his resume listed ▮▮▮▮ bullet points to show that the quality of his experience made up for its brevity. AR Tab 19 at 1236-37 (resume); AR Tab 5 at 67-68 (requirements for a generic senior professional); AR Tab 5 at 97-98 (requirements for a Securities Accounting Senior Professional). Therefore, both MMC and Cohen's proposals evidence that "a reasonably intelligent person acquainted with the contemporaneous circumstances" would interpret the Solicitation to require key personnel to have only similar experience to the listed requirements.

For these reasons, the court has determined that the FDIC did not make a critical and objective error or act in an arbitrary or capricious manner in concluding that the "[e]xperience and backgrounds of the proposed [MMC] management team mirrors industry experience required in the [Statement of Work]."

**b.** **The Location And Qualifications of Intervenor-Defendant's Staff.**

**i.** **The Plaintiff's Argument.**

The FDIC credited MMC with ▮▮▮▮ Mission Capability strengths. Cohen argues that the Administrative Record contradicts two of those findings: (1) MMC had a "[p]ool of ▮▮▮▮ professional staff *in core areas* . . . available to meet staffing needs *in Dallas and D*[.]*C*[.]," and (2) the "[e]xperience and backgrounds of the proposed management team *mirrors* industry experience required in the [Solicitation's Statement of Work]." Pl. Mot. JAR at 31 (quoting AR Tab 27 at 1412 (Panel Report) (emphasis added in brief) and citing AR Tab 31 at 1434 (Selection Recommendation Report using the same language to describe MMC's Mission Capability strengths)). In fact, MMC's proposal claimed only a "core base of over ▮▮▮▮ professionals working on client assignments *throughout the United States*[.]" Pl. Mot. JAR at 32 (quoting AR Tab 18 at 998, 1010 (MMC's BAFO) (emphasis added in brief)). Nothing in MMC's proposal, however, indicates that those ▮▮▮▮ professionals are available in Dallas and Washington, D.C. Pl. Mot. JAR at 32. Furthermore, nothing in MMC's proposal supports the FDIC's finding that MMC's self-described "core base" of professionals perform work in what the Agency described as "core areas" of the Solicitation. Pl. Mot. JAR at 32.

### ii.      The Government's Response.

The Government responds that the FDIC's evaluations of MMC's mission capability are discretionary and supported by the record.  Gov't Mot. JAR at 29.   Contrary to Cohen's assertion, the Panel report concluded only that MMC's ███████ professionals were "available to meet staffing needs in Dallas and D[.]C[.]," not that they were concentrated in those areas. Gov't Mot. JAR at 30.  The Panel was under no misapprehension about the location of MMC's employees.  Gov't Mot. JAR at 31 (quoting Panel evaluation sheets stating that "> ██████ [of them were] in D[.]C[.]—███████ in Dallas" (AR Tab 12 at 910), "located both D[.]C[.], Dallas— ██████" (AR Tab 12 at 924), and "Local Co. w/ ██████ employees in Dallas" (AR Tab 12 at 927)).[4]  Furthermore, the Government asserts that the court should not delve into the minutiae of the procurement process and substitute its judgment for the agency's regarding the proposals' relative merits.  *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations.") (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]he minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement . . . involve discretionary determinations of procurement officials that a court will not second guess.")).

### iii.      The Intervenor-Defendant's Response.

MMC asserts that "neither MMC's proposal nor the assigned strength states that 'each and every one' of the ██████ professionals described in MMC's proposal is currently located in either Dallas or Washington, D[.]C[.] or working in 'core areas' of the [Solicitation]."  Int. Mot. JAR at 18-19.  MMC's proposal stated, instead, that MMC "'currently employs over ██████ personnel in the Washington, D.C. area' and, during the previous 18 months, had 'employed over ██████ personnel in the Dallas, Texas metropolitan area.'"  Int. Mot. JAR at 19 (quoting AR Tab 18.1 at 977).  In addition, MMC's proposal stated that MMC deployed more than ██████ Dallas residents on FDIC contracts during the recent financial crisis.  Int. Mot. JAR at 19 (citing AR Tab 18.1 at 977).  The Panel's worksheets establish that the panel understood the location of MMC's employees.  Int. Mot. JAR at 20 (quoting Panel evaluation sheets stating that "> ██████ [of MMC's employees were] in D[.]C[.]—██████ in Dallas" (AR Tab 12 at 910); "over ██████ in Dallas now known to be qualified and available—██████" (AR Tab 12 at 912); " ██████ in D[.]C[.] . . . ██████ Dallas residents deployed . . . ██████ employed in Dallas" (AR Tab 12 at 922); "Local co. w/ ██████ employees in Dallas.  PM travel to/from D[.]C[.] . . . Management plan includes ██████ in D[.]C[.]" (AR Tab 12 at 927); " ██████ in Dallas area" (AR Tab 12 at 944); " ██████ employees on staff . . . ██████ @ FDIC—Dallas (# ██████ total)" (AR Tab 12 at 947); and " ██████ @ FDIC . . . ██████ Dallas" (AR Tab 12 at 953)).  Finally, nothing in the record supports Cohen's claim that every one of the ██████ personnel MMC referenced "provides sophisticated financial and accounting services that are at the core of the

---

[4] The Government's brief quotes the first sheet as stating " ██████ in Dallas" and the second sheet as stating "D[.]C[.] & Dallas" instead of "D[.]C[.], Dallas."  Gov't Mot. JAR at 31. The court assumes that the discrepancies likely are due to the barely legible reproduction of the handwritten evaluation sheets in the administrative record.  AR Tab 12.

[Solicitation]."  Int. Mot. JAR at 21.  Therefore, the FDIC's evaluation of MMC's proposal "reasonably reflected the benefits of MMC's nationwide hiring capabilities and its existing presence in the Dallas and Washington, D[.]C[.] areas[.]"  Int. Mot. JAR at 22.

#### iv.    The Court's Resolution.

The agency in a bid protest must provide "a coherent and reasonable explanation of its exercise of discretion[.]"  *Centech Grp.*, 554 F.3d at 1037.  There is nothing incoherent or unreasonable about the Panel Report's assertion that MMC's "[p]ool of ████ professional staff in core areas is available to meet staffing needs in Dallas and D[.]C."  AR Tab 27 at 1412.  First, MMC's proposal states that the ████ members of its professional staff are involved in "either ████ or ████, similar to that required under the Statement of Work."  AR Tab 18 at 998.  Therefore, the FDIC acted within its discretion in determining that those were "core areas," a phrase the Solicitation does not define.  *See E.W. Bliss Co.*, 77 F.3d at 449; *see also* AR Tab 5 at 28-150.  Second, nothing in the Panel Report implies that all ████ members of MMC's staffing pool live in Dallas or Washington, D.C.  The Panel Report says only that the pool is "available to meet staffing needs" in those cities, and the record does not disprove that assertion.  For these reasons, the court has determined that there were no critical and objective errors nor did FDIC act in an arbitrary and capricious manner in awarding MMC a Mission Capability strength based on the characteristics of MMC's professional staff pool.

### 2.    Whether The Agency Improperly Relaxed Minimum Solicitation Requirements By Accepting Intervenor-Defendant's Offer.

#### a.    The Plaintiff's Argument.

Cohen asserts that an agency must either enforce the minimum standards established in the Solicitation or amend the Solicitation and notify all offerors of the amendment.  Pl. Mot. JAR at 34 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999) (citing 48 C.F.R. § 15.606(a), (c) (1996) (requiring the government to issue a written amendment to a solicitation when it "changes, relaxes, increases, or otherwise modifies its requirements," and to provide an opportunity for competitors to submit new or amended proposals when it "depart[s] from the stated requirements"))).  In this case, the FDIC awarded a contract to MMC, despite MMC's admission that three of its key personnel did not meet the qualifications of the Solicitation.  Pl. Mot. JAR at 34 (citing AR Tab 5 at 71-104 (stating the "minimum qualifications" for each position, including five years of ████ experience for ████ Leads, and a ████ designation for ████ Leads) and AR Tab 18 at 1044, 1046, 1049 (admitting that those qualifications were unmet)).[5]  Specifically, MMC's proposed ████ did not meet the requirement of a "[m]inimum five years' experience working with ████ in a financial processing or accounting operations environment."  AR Tab 18 at 1044.  And, both of its proposed ████ Leads were not ████, as required by the Solicitation.  AR Tab 18 at 1046,

---

[5]  MMC's proposal lists "████" as the job title for the two proposed key personnel Cohen describes as "████ Leads."  Pl. Mot. JAR at 15 n.2 (explaining that there are two kinds of ████ Leads within ████ and that the job requirements MMC listed for the positions matched the requirements for ████ Leads).

1049. The FDIC's failure to note these shortcomings prejudiced Cohen, because if the FDIC had adhered to the Solicitation it would have "found MMC's proposal deficient for proposing unqualified personnel." Pl. Mot. JAR at 33-34.

### b.       The Government's Response.

The Government responds that Cohen again mischaracterizes the Solicitation as setting "minimum requirements" for key personnel.  Gov't Mot. JAR at 36-37.   There was no requirement in the Solicitation to identify in the proposal the staff who would fill particular positions or "that proposed key personnel met the minimum qualification requirements for any particular Functional Specialty position."  Gov't Mot. JAR at 37.  "[T]he FDIC simply evaluated the key personnel resumes to ensure that the functional areas were covered by the collective expertise of the proposed key personnel."  Gov't Mot. JAR at 38.  Because the Solicitation did not require that the proposed key personnel meet any minimum qualifications, the court cannot mandate such a requirement.  Gov't Mot. JAR at 38 (citing *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (holding that the trial court may not "introduce new requirements outside the scope of the [Solicitation]")).   In addition, Cohen cannot show prejudice, because Cohen also proposed key personnel who did not meet the minimum qualifications.

### c.       The Defendant-Intervenor's Response.

MMC contends that "the Solicitation gave complete discretion to the offeror to self-identify key personnel and did not require key personnel be assigned to particular labor categories or functional specialties."  Int. Mot. JAR at 26-27 (citing AR Tab 10 at 813 ("Key personnel are not associated with a particular labor category.")).   The FDIC did not relax its minimum requirements, because no minimum requirements existed.  Int. Mot. JAR at 26-28. Second, although Cohen argues that three MMC key personnel did not meet the requirements to be ███ the Solicitation did not require a ███ for the ███ and ███, the two areas in which those three key personnel were proposed.  Int. Mot. JAR at 26, 28-31 (citing AR Tab 5 at 32 (chart showing that the Solicitation required ███ in ███ under the baseline staffing model, but not in ███ or in ███); AR Tab 19.1 at 1236, 1239, 1245, 1284, 1287, 1290 (resumes showing that Cohen's proposal listed ███, not ███, in the ███ and ███ functional areas)).   Furthermore, even if MMC's key personnel did not satisfy the Solicitation's requirements, Cohen was not prejudiced, because "███ of [Cohen's] proposed key personnel did not meet the experience or qualification standards for the labor category and functional specialty for which they were proposed."  Int. Mot. JAR at 32-34 (citing AR Tab 19.1 at 1206 (establishing that the ███ did not have a requisite college degree); AR Tab 19.1 at 1203 (showing that the ███ did not have the required experience); AR Tab 19.1 at 1212 (showing that the ███ did not have the required experience); AR Tab 19.1 at 1221 (showing that the ███ did not have the required experience); AR Tab 19.1 at 1236 (showing that the ███ did not have the required experience); AR Tab 19.1 at 1255 (establishing that the ███ lacked the required experience); AR Tab 19.1 at 1258 (establishing that the ███ lacked the required experience); AR Tab 19.1 at 1276 (showing that the ███ did not have the required experience)).   Despite these deficiencies in Cohen's proposed workforce, the FDIC credited Cohen with a strength for management team experience and background, the same strength awarded MMC.  Int. Mot. JAR at 34 (citing AR Tab 27 at 1413).

### d.    The Court's Resolution.

Cohen's assertion that the FDIC relaxed the requirements in the Solicitation misinterprets the Solicitation's requirements.  As the court explained above, the Solicitation required that an offeror's proposed key personnel have "similar experience" to the position-specific experience requirements listed in the Solicitation.  Therefore, the FDIC did not relax the Solicitation's requirements, when it determined that MMC's key personnel had "similar experience," satisfying the Solicitation's terms.  For these reason, the court has determined that the FDIC did not relax the minimum requirements in the Solicitation and did not act in an arbitrary and capricious manner in awarding MMC a strength for management team experience and background.

### 3.    Whether The Agency Failed To Perform And Document A Price Realism Analysis As Required By The Solicitation And The Agency's Acquisition Regulations.

#### a.    The Plaintiff's Argument.

Next, Cohen asserts that the FDIC failed to conduct the price realism analysis required by the Solicitation and FDIC regulations, or, in the alternative, failed to document that analysis.  Pl. Mot. JAR at 23-30.  PGI procedural standards are binding in FDIC procurements.  Pl. Mot. JAR at 24 n.5 (citing *Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 527-28 (2010) (observing that the FDIC must adhere to the PGI)).  FDIC regulations "mandate a rigorous, well-documented analysis of price realism in every best value procurement."  Pl. Mot. JAR at 23 (citing PGI § 3.206(a)(2) (requiring that best value procurement must include "a determination of reasonableness, realism, and completeness for price"), § 3.210(c)(2) (listing the required elements of a price realism analysis)).  The Solicitation required price realism analysis of the labor rates contained in the proposals (Pl. Mot. JAR at 23 (citing AR Tab 5 at 150)), but "the *only* reference to realism in the [Panel] Report is a boilerplate statement that an unidentified Contract Specialist reviewed offerors' prices 'with respect to completeness, reasonableness, and realism'" (Pl. Mot. JAR at 25 (quoting AR Tab 27 at 1419)).  Instead of discussing the price realism elements required by PGI § 3.210(c)(2), the Panel Report included only a vague description of the methodology, using a "'summary' spreadsheet to 'compare' offerors' total prices," and "[t]he only 'summary sheets' in the Administrative Record are tables showing each offeror's total price."  Pl. Mot. JAR at 25 & n.6; Pl. Reply at 5.  Therefore, instead of evaluating whether the proposals' labor rates provided "reasonable compensation for the skill required in a labor category," as the Solicitation required, the Panel appears simply to have reviewed the labor rates solely "to ensure that all mandatory labor categories were addressed as required by the [Solicitation]."  Pl. Mot. JAR at 26 (quoting AR Tab 5 at 150 and AR Tab 27 at 1419); Pl. Reply at 5.  "Nowhere does [the Panel Report] analyze the offerors' total prices, let alone their labor rates[,] . . . evaluate whether the offerors' total prices and labor rates reflect an understanding of requirements, or introduce performance risk[, or] . . . examine . . . whether offerors' labor rates reflected 'reasonable compensation for the skill required in a labor category.'"  Pl. Reply at 5 (quoting AR Tab 5 at 150 (Solicitation) (emphasis omitted)).  Furthermore, although the Panel's individual worksheets contained a section for evaluating price realism, all of the Panel members

left that section blank. Pl. Mot. JAR at 26 (citing AR Tab 12 at 907, 921, 939 (worksheet price realism pages for MMC's proposal)). Although the Government argues that the worksheet sections were blank, because Panel members did not yet have the offerors' pricing information (Gov't Mot. JAR at 8), that does not explain the absence of any worksheets evidencing that Panel members ever performed the required analysis. Pl. Reply at 6 n.3.

Other documents evidence, not only the FDIC's complete failure to conduct price realism analysis but that the FDIC misconstrued what a price realism analysis requires. Pl. Mot. JAR at 27-28. For example, the Selection Recommendation Report, "like the [Panel] Report, contains only a conclusory, boilerplate statement that pricing was evaluated for reasonableness and realism." Pl. Mot. JAR at 27 (citing AR Tab 31 at 1433). A Best Value Analysis contains two charts listing ratings and prices, but no analysis. Pl. Mot. JAR at 27 (citing AR Tab 30 at 1429-30). Although the Selection Recommendation Report did mention realism, it conflated the concepts of realism and reasonableness. Pl. Mot. JAR at 27-28 (quoting the Report's finding that ██████ BAFO price "was unreasonable based on the work being performed and unrealistic compared to other labor hour price submissions" (AR Tab 31 at 1440)). "The FDIC's use of the term 'realism' . . . shows that the agency fundamentally misunderstood the nature of a realism analysis, and believed that both 'reasonableness' and 'realism' refer to an assessment of whether offerors' prices are too high." Pl. Mot. JAR at 28. As a result, "[t]he FDIC simply never considered or evaluated whether offerors' prices were too low." Pl. Mot. JAR at 28.

Moreover, the FDIC's complete failure to document any price realism analysis violates the APM and the PGI. Pl. Mot. JAR at 29 (citing APM ¶ 3.210(c) (stating that the Panel "is responsible for determining price realism and documenting its analysis in either the [Panel] Report or a written memorandum to the Contracting Officer") and PGI § 3.214(a)(2) (same)). Specifically, the FDIC was required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Pl. Mot. JAR at 29 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted)). The Government cannot remedy the FDIC's failure by speculating about the price realism analysis the FDIC might have done. Pl. Reply at 9 (citing *State Farm*, 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for [evaluation] deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))). Furthermore, the mere presence of General Services Administration labor rates in the Administrative Record does not evidence that the FDIC used those rates to analyze price realism. Pl. Reply at 12-13 & n.5 (noting that the rates were given the electronic filename "*Price Reasonableness* GSA Comps").

In addition, the FDIC's failure to conduct price realism analysis prejudiced Cohen, because "there is ample evidence that a rational evaluation of realism would have concluded that MMC's prices are in fact unrealistic." Pl. Reply at 16. MMC's total price was ██████ percent of the FDIC's estimate, and the FDIC's regulations specifically require the Panel to question an offeror if its price was far below the agency's estimate. Pl. Reply at 16-17 (citing Gov't Mot. JAR at 22-23 (conceding the ██████ percent figure); PGI § 3.210(c)(2) ("If an offeror's total proposed price . . . falls far short of the Program Office estimate for the requirement, the offeror's understanding of what is required must be questioned.")). Similarly, a price realism

analysis would have evidenced that MMC's labor rates were unrealistically low.  Pl. Reply at 17.
If the FDIC had performed a price realism analysis, as required, it is likely that the FDIC would
have eliminated MMC from the competition and selected Cohen, which was next in line for
award.  Pl. Reply at 17.

### b.      The Government's Response.

The Government responds that both the Panel Report and the Selection Recommendation
Report evidence that the FDIC performed price realism analysis.  Gov't Mot. JAR at 14.
Specifically, the Panel Report states that each proposal "was initially evaluated with respect
to . . . realism."  Gov't Mot. JAR at 14 (quoting AR Tab 27 at 1419).  Furthermore,

> The overall analysis of the pricing proposals was conducted by the Senior
> Contract Specialist, and a summary spreadsheet was provided to the [Panel] to
> compare the proposed pricing of the Offerors and confirm proposed pricing
> covered the initial period and all option periods, in accordance with the price
> schedule.  Additionally, the [Panel] reviewed the more detailed price schedules in
> the proposals to ensure that all mandatory labor categories were addressed as
> required by the [Solicitation].

Gov't Mot. JAR at 14-15 (quoting AR Tab 27 at 1419).

The Selection Recommendation Report states that the Panel was presented with the
"pricing per labor hour category for each Offeror . . . along with a calculation of total pricing for
the period of performance.  Pricing was evaluated on the basis of the realism and reasonableness
of the labor hour rates in relation to the proposed work."  Gov't Mot. JAR at 15 (quoting AR Tab
31 at 1433).

Although the Government concedes that the pricing evaluation sections of the Panel's
evaluation forms were left blank, this is not *prima facie* evidence that a price realism analysis did
not occur.  Gov't Mot. JAR at 15.  Instead, it shows that the pricing information was not
available at the time the Panel members completed the forms.  Gov't Mot. JAR at 15.  Moreover,
the court should apply a "presumption of regularity" and find that the FDIC conducted a proper
price realism analysis.  Gov't Mot. JAR at 16 (citing *Sickels v. Shinseki*, 643 F.3d 1362, 1366
(Fed. Cir. 2011) ("[I]n the absence of clear evidence to the contrary, the court will presume that
public officers have properly discharged their official duties.")).

In addition, the FDIC had broad discretion in conducting its price realism analysis,
because neither the Solicitation nor the PGI set forth detailed criteria to be considered.  Gov't
Mot. JAR at 16.[6]  In light of that FDIC discretion, the court should limit its review to ensuring

---

[6] The PGI states:

> The [Panel] evaluates price proposals to determine whether the proposed price for
> the work is realistic.  A realistic price is one that reflects a clear understanding of
> the requirement and is consistent with the offeror's technical proposal.  The
> elements of a price proposal can provide insight into an offeror's understanding of

that the FDIC considered available information and made no irrational assumptions or miscalculations. Gov't Mot. JAR at 17 (citing *Ala. Aircraft Indus*, 586 F.3d at 1375-76 ("The trial court's duty was to determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the [Solicitation.]")). In this case, the FDIC reasonably exercised its discretion, considered the available information, and made no irrational assumptions or miscalculations. Gov't Mot. JAR at 18. The FDIC considered both the overall estimated prices and the proposed labor rates. Gov't Mot. JAR (citing AR Tab 27 at 1419 (Panel Report overall price table); AR Tab 30 at 1429 (best value analysis worksheet); AR Tab 31 at 1433 (Selection Recommendation Report description of the price realism analysis methodology)). Moreover, not only did the Selection Recommendation Report reflect that the Panel evaluated the reasonableness of the labor hour rates, it also provided an example of that analysis. Gov't Mot. JAR at 19 (citing AR Tab 31 at 1440 (explaining that ████' pricing was "unreasonable based upon the work being performed and unrealistic compared to other labor hour submissions"); AR Tab 27 at 1423 (stating that the Panel "determined the types of services being offered by [Cohen and ████] did not warrant the higher costs proposed")).

In addition, the Government argues that MMC's prices were realistic, because they were ████ % of the prices proposed by three other offerors. Gov't Mot. JAR at 19 (citing AR Tab 27 at 1419). MMC's hourly rates were not the ████ for any labor category, and they were the ████ in only two of the six categories. Gov't Mot. JAR at 19-20. In addition, comparing MMC's labor rates with those in General Services Administration schedules demonstrates that MMC's rates were realistic. Gov't Mot. JAR at 21-22 (citing AR Tab 18.2 at 1053 (MMC's rates); AR Tab 29 at 1425-28 (GSA schedules)). Although the Administrative Record does not contain any document evidencing that the Panel made these comparisons, the court should infer that the FDIC considered the GSA schedules, because they are in the Administrative Record. Gov't Mot. JAR at 22 (citing *Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 161, 178 (2011) ("The court makes the modest inference that, if the contracting officer included an article in her file . . . the contracting officer reviewed these documents."); *Blue Lake Forest Prods., Inc. v. United States*, 75 Fed. Cl. 779, 793 (2007) ("[T]he Administrative Record filed by the agency . . . suggests that the agency considered the document to be necessary for the Court's resolution of the action, presumably[,] because the document informed the agency's own decisionmaking.")).

---

the requirement. If an offeror's total proposed price either greatly exceeds or falls far short of the Program Office estimate for the requirement, the offeror's understanding of what is required must be questioned. The [Panel] review and determination includes the appropriateness of:

- The number and qualifications of personnel to be assigned to the various aspects of the proposed work;

- Proposed labor rates or proposed material fees; and

- The price, amount, and necessity of travel.

PGI § 3.210(c).

In addition, the Government contests Cohen's assertion that MMC's price was unrealistic, because it was "████ % of the FDIC's own estimate." Gov't Mot. JAR at 22. Whether a price "falls far short" of an agency's estimate is within the agency's discretion. Gov't Mot. JAR at 22-23 (quoting PGI § 3.210(c) ("If an offeror's total proposed price . . . falls far short of the Program Office estimate for the requirement, the offeror's understanding of what is required must be questioned.")).  Here, seven of the eight offerors proposed prices below the FDIC's estimate, and several offerors' prices were only slightly higher than MMC's. Gov't Mot. JAR at 23.

Cohen also errs when it asserts that the FDIC's evaluation of ████' proposal evidenced a failure to understand that price realism analysis does not refer to an evaluation of whether a price is too high. Gov't Mot. JAR at 24. Under FDIC regulations, the purpose of a price realism analysis is to flag prices that are either too high or too low. Gov't Mot. JAR at 24 (citing PGI § 3.210(c)(2) (stating that a proposal's realism should be questioned "[i]f an offeror's total proposed price either greatly exceeds or falls far short of the Program Office estimate")).

The Government further contends that the FDIC's price realism analysis is sufficiently documented in the Administrative Record. Gov't Mot. JAR at 24-27; Int. Reply at 5-6 (citing: the Panel Report's statement that such an analysis was performed (AR Tab 27 at 1419-20), the Source Selection Recommendation's statement that ████' price was unrealistic (AR Tab 31 at 1440), the Source Selection Recommendation's statement that "[p]ricing was evaluated on the basis of the realism and reasonableness of the labor hour rates in relation to the proposed work" (AR Tab 31 at 1433), and the Source Selection Recommendation's statement that MMC "offers fair and reasonable competitive labor rates" (AR Tab 31 at 1446)).  This should satisfy the court, because the Administrative Record need only be sufficient for the "agency's path [to] reasonably be discerned." Gov't Mot. JAR at 24-25 (quoting *State Farm*, 463 U.S. at 43); Gov't Reply at 3 (quoting *Nucor Corp. v. United States*, 414 F.3d 1331, 1341 (Fed. Cir. 2005) ("[J]udicial review of an agency's findings does not demand expansive discussion or rigid adherence to a specific formula.")).  Therefore, there is sufficient evidence for judicial review under the Administrative Procedure Act. Gov't Mot. JAR at 25 (citing *Impreza Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337-38 (Fed. Cir. 2001) (holding that the Administrative Procedure Act does not require contracting officers to provide written explanations of their actions); APM ¶ 3.210(c) (stating that the Panel "is responsible for determining price realism and documenting its analysis in either the [Panel] Report or a written memorandum to the Contracting Officer")).  Furthermore, lengthy documentation was not necessary here, because the pricing was straightforward, *i.e.*, the price equaled the labor category rate multiplied by the number of hours the Solicitation required for each labor category. Gov't Mot. JAR at 26; Gov't Reply at 4.

Finally, even if the FDIC failed to perform or document a price realism analysis, Cohen cannot show that it was prejudiced by this failure. Gov't Mot. JAR at 27-29 (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (requiring a showing of prejudice, and holding that "to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract").  Even if MMC's prices fell far short of the FDIC's price estimate, that alone would not have rendered MMC's prices unrealistic. Gov't Mot. JAR at 27 (citing PGI

§ 3.210(c) (stating that a price that falls far short of an agency's estimate triggers an inquiry of whether the offeror had an "understanding of what is required")). The FDIC's evaluation of MMC's Mission Capability demonstrates "that MMC fully understood the [Solicitation's] requirements and the FDIC had no reason to think that MMC would not perform adequately." Gov't Mot. JAR at 28 (citing AR Tab 27 at 1412-13 (Panel Report technical evaluation results for MMC)). Therefore, "there is nothing in the record to suggest that the outcome of the procurement would have been any different, even if the FDIC considered MMC's pricing to fall 'far short' of the FDIC's internal estimate." Gov't Mot. JAR at 29.

### c.       The Defendant-Intervenor's Response.

MMC responds that the FDIC determined that MMC's proposal "is technically strong, has exceptional past performance, *and offers fair and reasonable competitive labor rates.*" Int. Mot. JAR at 7 (quoting AR Tab 31 at 1446 (Selection Recommendation Report) (emphasis added)). Although the FDIC was required to perform a price realism analysis, MMC asserts, that analysis did not need to be as rigorous as Cohen contends. Int. Mot. JAR at 8 (citing *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (holding that price realism analysis need not "be performed with impeccable rigor," and "any assessment of the rationality of [the agency's] calculations must take into account the limited amount of information available")). Cohen "did not offer any meaningful evidence that MMC's proposed prices are unrealistically low, that the work cannot be performed at the prices MMC proposed, that MMC lacked understanding of the requirements, or that MMC poses a heightened risk of performance." Int. Mot. JAR at 12. Cohen's assertion that MMC's proposed price was ████ percent of the Agency estimate is not *prima facie* evidence that MMC's price was unrealistic. Int. Mot. JAR at 16 (citing *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693-94 (1999) (determining that a proposed labor rate that was fifty-three percent lower than the incumbent contract rate was not unrealistic)).

In addition to making many of the arguments made by the Government, MMC explained that it was able to offer lower labor rates by using "████." Int. Mot. JAR at 13. MMC's labor rates ████, while Cohen's labor rates ████. Int. Mot. JAR at 13 & n.5 (explaining that the different ████). Here, the FDIC compared MMC's rates with four companies' General Services Administration Financial and Business Solutions schedule contract rates and MMC's labor rates aligned with three of those companies' rates. Int. Mot. JAR at 14-15 & n.7. Furthermore, MMC's more than twenty years of experience, including experience with the FDIC during the recent financial crisis, evidence that "MMC knows the market and what it takes to staff contracts, like this one." Int. Mot. JAR at 15-16.

Finally, MMC contends that the FDIC's ████ price estimate was a budgetary cap, and, therefore, realistic prices need not have been at or near that level. Int. Mot. JAR at 16 (citing AR Tab 1 at 1 (requesting authorization to spend "up to ████ for contractor compensation"), 9 (defining "the anticipated maximum funding projection under the contract"); AR Tab 4 at 14 (describing ████ as the "funding ceiling")). The ████ estimate also was based on a ████. Int. Mot. JAR at 17 (citing AR Tab 1 at 8 ("████"); AR Tab 5 at 33 ("████")). "[T]hese factors undermine[] [Cohen's] undue reliance on the [agency's] budgetary estimate as evidence that MMC's proposed prices were so unrealistically low that they should have caused the [Panel]

to question MMC's understanding of the requirements or adjust MMC's Mission Capability rating." Int. Mot. JAR at 17.

### d. The Court's Resolution.

The FDIC's acquisition regulations require the Panel to "determin[e] price realism and *document*[] its analysis in either the [Panel] Report or a written memorandum to the [CO]." APM ¶ 3.210(c) (emphasis added). The Administrative Record contains no written memorandum to the CO, and in the fifteen-page Panel Report the documentation of price realism analysis consists of a single paragraph stating only that such analysis was performed, together with a chart showing each offeror's overall proposed price:

> The pricing proposal of each Offeror was initially evaluated with respect to completeness, reasonableness, and realism. The overall analysis of the pricing proposals was conducted by the Senior Contract Specialist, and a summary spreadsheet was provided to the [Panel] to compare the proposed pricing of the Offerors and confirm proposed pricing covered the initial period and all option periods, in accordance with the price schedule. Additionally, the [Panel] reviewed the more detailed price schedules in the proposals to ensure that all mandatory labor categories were addressed as required by the [Solicitation]. The proposed pricing was as follows:



Mir Mitchell & Company, LLP          $11,496,293
Martin W. Cohen & Company            $

AR Tab 27 at 1419.

Therefore, the Panel Report evidences that the Panel *conducted* a price realism analysis, but it failed to provide that analysis, or even the conclusions thereof, in violation of APM ¶ 3.210(c) and PGI § 3.214(a). APM ¶ 3.210(c) (requiring that the Panel Report document the FDIC's price realism analysis); PGI § 3.214(a) (same). Without a description of the facts analyzed, and the reasoning that connects the facts with the conclusions, the court is not in a position to determine whether an agency exercised its discretion in a non-arbitrary manner. *See Banknote*, 365 F.3d at 1357-58 (affirming a trial court determination that best value analysis documentation requirements were met, because "the contracting officer described why he believed that [three offerors] represented the strongest best value selections, while [two others] did not, and explained the relative strengths and weaknesses of the offerors in the evaluation categories underlying the technical rankings").

It is a well settled principle of administrative law that a federal agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).  Although the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," the court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*  In this case, the Government and MMC conducted the price realism analysis in their briefs and asked the court simply to infer that the FDIC made similar use of the data in the Administrative Record.  Gov't Mot. JAR at 21-22 (citing AR Tab 18.2 at 1053 (MMC's rates); AR Tab 29 at 1425-28 (GSA schedules)); Int. Mot. JAR at 12-17 (analyzing the labor rates in every proposal and the GSA schedules).  Argument, however, is not an acceptable substitute for compliance.  For example, the Administrative Record is silent about whether, how, and why the FDIC compared various labor categories in the Solicitation with the labor categories in the GSA schedules, and the court notes that, in fact, the Government and MMC do not agree about which categories are equivalent.  *Compare* Int. Mot. JAR at 14, *with* Gov't Mot. JAR at 21.  The briefs of the Government and MMC include a price realism analysis that compares MMC's labor rates to those of ▒▒▒▒, one of the contractors whose rates are in the GSA schedules.  Gov't Mot. JAR at 21; Int. Mot. JAR at 14.  But the Government and MMC disagree about how seven of the twelve ▒▒▒▒ labor categories align with the labor categories in the Solicitation.  *See* AR Tab 29 at 1427 (showing ▒▒▒▒ rates by labor category); Gov't Mot. JAR at 21; Int. Mot. JAR at 14.  Specifically, MMC considers a ▒▒▒▒ "Junior Financial Analyst" comparable to the Solicitation's "Senior Professional," but the Government considers the Solicitation's "Professional" labor category a better match.  Int. Mot. JAR at 14; Gov't Mot. JAR at 21.  Confronted with differing *post hoc* analyses of data in the Administrative Record, the court cannot determine whether the FDIC's analysis matched the Government's, MMC's, or neither.  In short, the FDIC's decisionmaking path cannot "reasonably be discerned."  *See State Farm*, 463 U.S. at 43.  The Government's citations to *Acrow* and *Blue Lake Forest* are unavailing, because in those cases the court inferred only that an agency reviewed and used documents in the Administrative Record, whereas in this case, the Government and the Intervenor ask the court to infer the content of the analysis that was conducted based on the existence of certain documents in the Administrative Record.  The Administrative Record documents the result of price realism analysis with respect to only one proposal—▒▒▒▒' (AR Tab 31 at 1440 (Selection Recommendation Report describing it as "unrealistic compared to other labor hour price submissions")), but there is no document in the Administrative Record that supports this conclusion.[7]  The Government and MMC quote the FDIC's conclusion that MMC's proposal "offers fair and reasonable competitive labor rates" (AR Tab 31 at 1446), but that quotation does not establish the realism of MMC's prices, let alone document or analyze their realism.  *Compare* PGI § 3.210(c)(1) (defining price reasonableness as competitiveness in comparison with the prices submitted by other offerors, the prices charged for similar goods or services, the Agency's price estimate, or the prices required by law), *with* PGI § 3.210(c)(2) (defining price realism as an assessment of whether the price "reflects a clear understanding of

---

[7] Cohen incorrectly challenges this finding as a misapplication of the concept of price realism, but under the FDIC's regulations prices can be determined to be unrealistically high or unrealistically low.  Pl. Mot. JAR at 27-28; PGI § 3.210(c)(2) (triggering questioning of a proposal's realism "[i]f an offeror's total proposed price either greatly exceeds or falls far short of the Program Office estimate").

the requirement and is consistent with the offeror's technical proposal"). For these reasons, the court has determined that the FDIC's failure to evidence that a price realism analysis was conducted is not rational.

"To establish prejudice [a bid protest plaintiff must] show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum*, 404 F.3d at 1358. Cohen interprets the record as evidencing that MMC's proposed price was ████ percent of the FDIC's estimate of the maximum amount it would need to spend on the contract, and the Government does not challenge that assertion. *Compare* Pl. Reply at 16-17 *with* Gov't Mot. JAR at 22-23.[8] Although MMC cites to *CTA* for the proposition that a bid more than forty percent below the Government's estimate can still be realistic, the *CTA* court reached that determination only after quoting a detailed price realism analysis in the Administrative Record, an analysis that is missing in this case. *See CTA*, 44 Fed. Cl. at 693-94 (noting the agency's comparisons of various proposed rates and concluding that a "larger labor pool" resulted in "a dramatic reduction in pricing"). For these reasons, the court has determined that there is a substantial chance that documented price realism analysis would have led the FDIC to award the contract to Cohen.

### E.   A Preliminary Injunction Is Warranted.

The February 8, 2013 Amended Complaint requests that the court "[g]rant Cohen . . . permanent injunctive relief requiring the FDIC to set aside the award of the [business operations support] contract to MMC." Am. Compl. at 27. Although Cohen's February 8, 2013 Motion For

---

[8] The Administrative Record contains no evaluation of MMC's price as a percentage of the FDIC's estimate. Likewise, there is reason to doubt the accuracy of the ████ percent figure that Cohen calculated by subtracting the fourth-quarter 2012 prices from MMC's proposal and then expressing the result as a percentage of the FDIC's estimate. Pl. Mot. JAR at 16 (using $████ as MMC's "2013-18 Total" and citing AR Tab 18 at 1053 (MMC's $11,496,293 price, including $████ for the fourth quarter of 2012)); *see also* AR Tab 1 at 8-9 (stating that the FDIC estimate used calendar years 2013-2018, whereas the actual contract was to run from the fourth quarter of 2012 through the end of the third quarter of 2018). Cohen also did not account for other differences between the assumptions used to calculate the FDIC's estimate and those used by MMC. As MMC noted, its price was based on ████, and the FDIC's estimate was based on ████. *Compare* AR Tab 18 at 1053 (stating that MMC's price calculation was based on ████), *with* AR Tab 1 at 8 (stating that the FDIC's estimate was based on ████). Also, the FDIC estimate and the offerors' proposals were based on different staffing level assumptions. *Compare* AR Tab 1 at 8 (stating that the FDIC's estimate for each year was based on the average staff levels for that year and the previous year), *with* AR Tab 18 at 1053 (MMC using the staffing levels for each year, with no averaging). As a result, MMC's and Cohen's 2014 total costs were based on staffing levels of zero "Professionals," whereas the FDIC's estimate included ████ in 2014 pay for "Professionals." *Compare* AR Tab 18 at 1053 (MMC proposal), *and* AR Tab 19 at 1302 (Cohen's proposal), *with* AR Tab 1 at 8 (FDIC estimate). The differences in methodology between the FDIC's estimate and the offerors' proposals explains why it would be erroneous for the court to "infer" a price realism analysis from this Administrative Record.

Judgment On The Administrative Record seeks a permanent injunction (Pl. Mot. JAR at 2), the court considers a preliminary injunction more appropriate to the circumstances in this case. *See* 28 U.S.C. § 1491(b)(2) (authorizing the court to "award any relief that the court considers proper, including . . . injunctive relief").

In considering whether to issue a preliminary injunction the court is required to weigh four factors: "(1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties." *U.S. Ass'n of Imp. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005). "No one factor, taken individually, is necessarily dispositive . . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

As to the first factor, the Administrative Record evidences no documentation of price realism analysis of the proposals submitted by MMC and Cohen. Without injunctive relief, Cohen will suffer immediate and irreparable harm by losing the opportunity to be awarded the business operations support Contract at issue. *See Linc Gov't Servs. v. United States*, No. 12-522, 2012 WL 6869632 (Fed. Cl. Dec. 28, 2012) (issuing a preliminary injunction after finding documentation in the Administrative Record was insufficient for the court to review a bid protest). Therefore, the first factor weighs in favor of an injunction.

As to the second factor, a likelihood of success on the merits, Cohen has established that, without more thorough documentation than has been submitted in the Administrative Record, it will succeed on its claim that the FDIC violated APM ¶ 3.210(c) and PGI §§ 3.210(c) and 3.214(a) and the award of the contract to MMC was arbitrary and capricious.

As to the third factor, the Government and MMC argue that an injunction would be contrary to the public's interest in minimizing the procurement costs. Int. Reply at 19; Gov't Mot. JAR at 40. It is well established that a "protest case cannot be efficiently processed until production of the administrative record" is provided. RCFC App. C ¶ 23; *see also Google, Inc. v. United States*, 95 Fed. Cl. 661, 679 (2011) (stating that "the Administrative Record should include all relevant documents" relating to the procurement process at issue); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ("Clearly the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."). Therefore, the court has determined that the public interest is served by a preliminary injunction in this case.

As to the fourth factor, the balance of hardships, the Agency can extend the Cohen and Quantum contracts until a new business operations support contract can be awarded. Therefore, the hardship that a preliminary injunction will impose on the FDIC is minimal. Any necessary expense is wholly attributable to the FDIC's unexplained failure to conduct and document a price realism analysis. For this reason, the court has determined that the balance of the hardships favors granting an injunction.

## IV.    CONCLUSION.

For these reasons, it is hereby ordered that:

This procurement is remanded to the Agency "for additional investigation or explanation" regarding price realism analysis with respect to Solicitation No. RECVR-12-R-0088.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  The FDIC and its officers, agents, servants, employees, and representatives are preliminarily enjoined from proceeding with or awarding contracts for business operations support services for the FDIC Division of Resolutions and Receiverships, pursuant to Solicitation No. RECVR-12-R-0088 or any related procurement, solicitation, task order, or activity.  *See* RCFC 65(a).[9]

As set forth in RCFC 52.2(b)(1)(B), the remand will expire in six months, during which time the preliminary injunction will be in effect.  The Government will report to the court every ninety days on the status of the remand proceedings.  *See* RCFC 52.2(b)(1)(D).


**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[9] This Order was issued on March 27, 2013 at 3:45 p.m. (EDT).