# In the United States Court of Federal Claims

No. 13-37
Filed under seal: August 1, 2013
Reissued for publication: August 12, 2013[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| COHEN FINANCIAL SERVICES, Inc., | * Bid protest; |
| | * FDIC Acquisition Policy Manual ¶ 3.210(c) |
| | * (price evaluation); |
| Plaintiff, | * FDIC Acquisition Procedures, Guidance, |
| | * and Information |
| v. | * 3.206(a)(2) (required price analysis in |
| | * best value procurements); |
| THE UNITED STATES, | * 3.210(c)(2) (price realism); |
| | * 3.214 (documentation of source |
| Defendant, | * selection); |
| | * 5 U.S.C. § 706(2)(A) (review under the |
| and | * Administrative Procedure Act); |
| | * 28 U.S.C. § 1491(b)(4) (review of bid |
| MIR MITCHELL & COMPANY, LLP, | * protests); |
| | * RCFC 15(a) (amended pleading). |
| Intervenor-Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Jason A. Carey, Luke W. Meier**, McKenna Long & Aldridge, Washington, D.C., Counsel for Plaintiff.

**Corinne A. Niosi**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Scott McCaleb**, Wiley Rein, LLP, Washington, D.C., Counsel for Intervenor-Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

---

[*] This published version of the August 1, 2013 Memorandum Opinion And Final Order incorporates proposed agreed redactions submitted by the parties.

## I.   RELEVANT FACTUAL BACKGROUND.[1]

### A.   The Solicitation.

On July 2, 2012, the Federal Deposit Insurance Corporation ("FDIC") issued Solicitation No. RECVR-12-R-0088 (the "Solicitation").   AR Tab 5 at 28-150.   The purpose of the Solicitation was to provide business operations support services for the FDIC's Division of Resolutions and Receiverships.   AR Tab 5 at 37.   To provide those services, the Solicitation required that a core group of contract workers be available in six functional areas—cash management, financial processing, general accounting, tax, securities accounting, and global functions—plus the capability to expand the number of workers quickly in the event of an increased workload.   AR Tab 5 at 37, 40.   Staffing levels could be as low as ten workers and as high as 131.   AR Tab 5 at 31, 42.   The period of performance was to run from the signing of the contract through December 31, 2014, but the FDIC had the option to extend the performance period for four additional one-year periods.   AR Tab 5 at 38.

The Solicitation required each offeror to propose a single hourly pay rate for six pay grades:  project manager, team lead, senior professional, professional, technician, and administration.   AR Tab 5 at 31-32.   Although the Solicitation provided for only those six pay grades, it required a workforce capable of delivering services in seventeen specializations.   AR Tab 5 at 39.   Offerors were required to "demonstrate that proposed key personnel possess the necessary experience and qualifications."   AR Tab 5 at 143.

The FDIC was required to award the contract based on best value, considering three elements, in descending order of importance: Mission Capability, Past Performance, and Price.   AR Tab 5 at 146.   Although Price was listed third in order of importance,

> [t]he degree of importance of price as a factor . . . could increase depending upon how equally matched the competing proposals are for the other factors evaluated. When competing proposals are judged to be equal upon evaluation of the other factors considered in the best value analysis, total price and other price factors would become the most significant factor.

AR Tab 5 at 146.   The price proposals were to be "evaluated with respect to completeness, reasonableness, and realism."   AR Tab 5 at 149.   Under realism, the Solicitation stated, "Labor rates that do not reflect a reasonable compensation for the skill required in a labor category will be considered unrealistic."   AR Tab 5 at 150.

---

[1] The relevant facts were derived from the January 25, 2013 Administrative Record, as supplemented on February 4 and 13, 2013 ("AR Tab 1-69 at 1-2922").

**B.     The Proposals.**

Eight offerors, including Cohen Financial Services, Inc. ("Cohen") and defendant-intervenor Mir Mitchell & Company, LLP ("MMC"), submitted proposals in response to the Solicitation.  AR Tab 9 at 812.  The two proposals at issue here are those of Cohen and MMC.

Cohen submitted a timely proposal.  AR Tab 7 at 153-612 (undated proposal); AR Tab 9 at 812 (FDIC abstract showing Cohen's submission was on time).  The members of the FDIC's Technical Evaluation Panel ("Panel") rated Cohen's proposal as follows:

| | Ron Bruckner | William R. Baucum | Diane Bradford | Maximum points available |
|---|---|---|---|---|
| Mission Capability | | | | |
| Technical approach | 30 | 35 | 36 | 40 |
| Management plan | 40 | 35 | 35 | 45 |
| Key personnel | 10 | 10 | 12 | 15 |
| Total* | 80 | 80 | 83 | 100 |
| Past Performance | Exceptional/High Confidence | Very Good/ Significant Confidence | Very Good/ Significant Confidence | |
| Oral Presentation | | | | |
| Management plan overview | (no subtotal) | 20 | 20 | 25 |
| Transition plan overview | (no subtotal) | 15 | 13 | 15 |
| Capability to provide contractor support in Dallas and D.C. | (no subtotal) | 20 | 15 | 15 |
| Key personnel and maintenance of core competence | (no subtotal) | 15 | 22 | 25 |
| Past experience supporting the banking industry/failed financial institutions | (no subtotal) | 10 | 15 | 20 |
| Total* | 88 | 80 | 85 | 100 |

* The evaluation form contained a line labeled "CONSENSUS," but no line labeled "Total," so that the format of the evaluations was not consistent.  For example, Ms. Bradford's Mission Capability subtotals added up to 83, but she listed 80 on the "CONSENSUS" line.  As to Oral Presentation, Ms. Bradford wrote 88 on the CONSENSUS line, but noted and circled her total of 85 elsewhere on the page.  Mr. Bruckner wrote 88 on the CONSENSUS line and also "MY SCORE 88" elsewhere on the sheet.  Mr. Baucum's total was 80, on the CONSENSUS line.

AR Tab 11 at 838-94.

On July 31, 2012, MMC also timely submitted a proposal.  AR Tab 8 at 613-811 (proposal); AR Tab 9 at 812 (FDIC abstract showing MMC's submission was on time).  The Panel rated MMC's proposal as follows:

| | Ron Bruckner | William R. Baucum | Diane Bradford | Maximum points available |
|---|---|---|---|---|
| Mission Capability | | | | |
| Technical approach | 30 | 30 | 31 | 40 |
| Management plan | 35 | 35 | 36 | 45 |
| Key personnel | 10 | 10 | 12 | 15 |
| Total* | 75 | 75 | 79 | 100 |
| Past Performance | Very Good/ Significant Confidence | Very Good/ Significant Confidence | Satisfactory/ Confidence | |
| Oral Presentation | | | | |
| Management plan overview | (no subtotal) | 23 | 22 | 25 |
| Transition plan overview | (no subtotal) | 17 | 15 | 15 |
| Capability to provide contractor support in Dallas and D.C. | (no subtotal) | (no subtotal) | 13 | 15 |
| Key personnel and maintenance of core competence | (no subtotal) | (no subtotal) | 25 | 25 |
| Past experience supporting the banking industry/failed financial institutions | (no subtotal) | (no subtotal) | 15 | 20 |
| Total* | | 75 | 90 | 100 |

\*      Again, the evaluation form contained a line labeled "CONSENSUS," but no line labeled "Total," so that the format of evaluations was not consistent.  For Oral Presentation, Mr. Baucum listed 75, presumably his total; Ms. Bradford listed 88 on the CONSENSUS line, but circled her total, 90, elsewhere on the page.  Mr. Bruckner listed 88 on the CONSENSUS line.

AR Tab 12 at 895-958.

After the Panel completed individual ratings, it convened a "meeting and determined a consensus rating for each Offeror's technical proposal."  AR 27 at 1411.  Those consensus ratings and the initial prices were as follows:

| Offeror | Score | Past Performance | Initial Price | Minority Status |
|---|---|---|---|---|
| MMC | 75 | Very Good/Significant Confidence | $11,496,293 | Women-Owned |
| Cohen | 80 | Very Good/Significant Confidence | $17,366,342 | |
| ██████ | 80 | Very Good/Significant Confidence | $15,950,143 | ███ |
| | 85 | Excellent/High Confidence | $22,999,060 | |
| | 70 | Satisfactory/Confidence | $14,027,065 | |
| | 70 | Satisfactory/Confidence | $13,553,100 | |
| | 60 | Neutral/Neutral | $13,956,986 | |
| | 45 | Moderate/Low Confidence | $8,501,958 | |

AR 27 at 1412.

Next, the Contracting Officer ("CO") determined that the proposals of MMC, Cohen, ████ were within the competitive range and held discussions with each of those offerors.  AR Tab 27 at 1419.

On September 4, 2012, the FDIC sent MMC and Cohen requests for best and final offers ("BAFO").  AR Tab 13 at 959-60; AR Tab 14 at 961-62.  The letter to MMC listed the following areas "that may benefit from improvement": "Post close missing A/P and Cash Management"; "Minimal support for bank control area"; and "Missing support for Cash Management."  AR Tab 13 at 959-60.  The letter to Cohen listed: "Insufficient support for non cash management areas"; and "Past performance information old."  AR Tab 14 at 962.  On September 5, 2012, Cohen sent the FDIC an email requesting clarification.  AR Tab 16 at 966.  On September 6, 2012, the FDIC responded that it "Need[ed] more information re: large scale development of accounting systems, implementation and maintenance"; wanted information about Cohen's "experience in structured sales accounting [and] property management accounting"; and requested "support for dashboard reporting."  AR Tab 17 at 968.

On September 11, 2012, MMC submitted its BAFO.  AR Tab 18 at 971-1053.  Cohen also submitted its BAFO.  AR Tab 19 at 1054-1330 (undated).  On September 13, 2012, Cohen and MMC were invited to make oral presentations.  AR Tab 20 at 1331; AR Tab 21 at 1332.

On October 10, 2012, the Panel issued a report, concluding that MMC represented "the overall Best Value for the FDIC" and recommending that the contract be awarded to MMC.  AR Tab 27 at 1408-23.  The Panel summarized the selection data as follows:

| Offeror | BAFO Technical Score | Oral Technical Score | Total Technical Score | BAFO Price |
|---------|----------------------|----------------------|-----------------------|------------|
| MMC | 75 | 88 | 163 | $11,496,293 |
| Cohen | 80 | 88 | 168 | $15,616,985 |
| ████ | 80 | 60 | 140 | $15,950,143 |

AR 27 at 1422.

The Panel also explained that "the three competing proposals were determined to be generally equal when comparing actual Mission Capability scores when combined for the Technical Evaluation and the Oral Presentation as well as the Past Performance factors."  AR Tab 27 at 1423.  "[T]he types of services being offered by these companies did not warrant the higher costs proposed by [Cohen] or by ████."  AR Tab 27 at 1423.

On November 8, 2012, the FDIC finalized its Selection Recommendation Report and approved awarding the Receivership Basic Ordering Agreement for Business Operations Support Services to MMC.  AR Tab 31 at 1443.  On November 28, 2012, the FDIC awarded MMC a contract, effective January 1, 2013.  AR Tab 32 at 1447.

On December 7, 2012, the CO responded to Cohen's request for a debriefing with a letter stating, "I can tell you now that the focus of a debrief with Cohen is Proposal Price.  This simply means that your price was too high."  AR Tab 41 at 1782.  On December 12, 2012, Cohen filed a protest with the FDIC.  AR Tab 34 at 1560-1769.  On December 13, 2012, Cohen submitted a

correction to its December 12, 2012 protest.  AR Tab 35 at 1770.  The basis for Cohen's protest was the FDIC's alleged failure to notify it of "any deficiencies in its proposal relating to price."  AR Tab 34 at 1561.  On December 27, 2012, the FDIC denied Cohen's protest, because when it held discussions with the offerors, the FDIC was concerned only about whether the prices were within the competitive range—and Cohen's price was within that range.  AR Tab 37 at 1774-77.

## II.   PROCEDURAL HISTORY.

On January 15, 2013, Cohen filed a post-award bid protest Complaint ("Compl.") in the United States Court of Federal Claims, alleging that the FDIC violated section 3.210(c)(2) of its Acquisition Procedures, Guidance, and Information ("PGI") and the terms of the Solicitation by failing to perform a reasonable price realism analysis of MMC's proposal.  Compl. ¶¶ 93-101.  The January 15, 2013 Complaint also alleges that the FDIC improperly relied on MMC's misrepresentations about the key personnel that MMC intended to hire.  Compl. ¶¶ 102-13.

On the same day, Cohen also filed: a Motion For Temporary Restraining Order And Preliminary Injunction; a Motion For Leave To File Under Seal; and a Motion For A Protective Order.  On January 16, 2013, the court held a telephone conference to consider Cohen's motions.  Pursuant to that telephone conference, on January 17, 2013, Cohen's Motion For A Protective Order was granted, and the FDIC voluntarily issued a stop work order of up to ninety days, pending resolution of this case.  AR Tab 39 at 1779.  On January 18, 2013, the FDIC modified its contract with Cohen to rescind a scheduled January 31, 2013 Termination for Convenience and set a new expiration date of April 13, 2013.  AR Tab 40 at 1781.

On January 18, 2013, MMC filed an Unopposed Motion To Intervene, that the court granted on January 22, 2013.

On January 25, 2013, the Government filed an Unopposed Motion For Leave To File The Administrative Record On DVD, that the court granted on the same day.

On February 4, 2013, the Government filed a Motion For Leave To Correct The Administrative Record.  On February 5, 2013, Cohen requested a status conference regarding the Administrative Record.  On February 6, 2013, the court granted Cohen's Motion and held a telephone status conference.  On February 13, 2013, the Government filed a Second Motion For Leave To Correct The Administrative Record.  On March 27, 2013, the court granted the Government's February 4, 2013 and February 13, 2013 Motions.

On February 8, 2013, Cohen filed a Motion For Judgment On The Administrative Record and a First Amended Complaint ("Am. Compl.") arguing that the FDIC: failed to perform and document price realism analysis, as required by its regulations and the Solicitation; acted arbitrarily and capriciously in its erroneous evaluation of MMC's mission capability; and violated its regulations by relaxing the minimum requirements set forth in the Solicitation.  On February 22, 2013, the Government filed a Cross-Motion For Judgment Upon The Administrative Record And Response.  On the same day, MMC filed a Cross Motion For Judgment On The Administrative Record.  On March 5, 2013, Cohen filed a Reply.  On March 15, 2013, the Government filed a Reply and MMC filed a Reply.

On March 26, 2013, the court held a hearing regarding the requested injunctive relief.  On March 27, 2013, the court issued a Memorandum Opinion And Order, remanding the procurement "to the [FDIC] 'for additional investigation or explanation' regarding price realism analysis with respect to Solicitation No. RECVR-12-R-0088."  *Cohen Fin. Servs. Inc. v. United States*, 110 Fed. Cl. 267, 289 (2013).  The court also issued a preliminary injunction barring the FDIC "from proceeding with or awarding contracts for business operations support services for the FDIC Division of Resolutions and Receiverships, pursuant to Solicitation No. RECVR-12-R-0088 or any related procurement, solicitation, task order, or activity."  *Id.*

On May 10, 2013, the Government filed a Status Report, informing the court that the FDIC conducted a new price realism analysis, that the Panel prepared revised reports to explain and support this price realism analysis, and that the revised Selection Recommendation Report recommended awarding the contract to MMC.[2]  On the same day, the Government filed a Motion To Dissolve The Preliminary Injunction.  On May 20, 2013, MMC filed a Response.  On May 21, 2013, the court held a hearing, during which it denied the Government's May 10, 2013 Motion To Dissolve The Preliminary Injunction.

On May 13, 2013, Cohen filed a Motion For A Scheduling Order.  On May 14, 2013, the Government and MMC filed Responses.  On May 28, 2013, the court issued a scheduling order.

On June 7, 2013, Cohen filed a Second Amended Complaint ("Sec. Am. Compl.") containing a single claim that the FDIC violated its regulations by failing to conduct and document a rational price realism analysis.[3]  On the same day, Cohen filed a Motion For Judgment On The Administrative Record ("6/7/13 Pl. Mot. JAR").  On July 1, 2013, the Government filed a Motion For Judgment On The Administrative Record ("7/1/13 Gov't Mot. JAR") and MMC filed a Motion For Judgment On The Administrative Record ("7/1/13 Int. Mot. JAR").  On July 9, 2013, Cohen filed a Reply ("7/9/13 Pl. Reply").  On July 16, 2013, the Government filed a Reply ("7/16/13 Gov't Reply") and MMC filed a Reply ("7/16/13 Int. Reply").

## III.   THE AGENCY'S PRICE REALISM ANALYSIS ON REMAND.

Following the issuance of the court's March 27, 2013 Memorandum Opinion and Order remanding the case, the FDIC reconvened the Panel and conducted price realism analysis.  AR Tab 71 at 3564-71.  The Panel compared the offers to the Independent Government Cost Estimate ("IGCE") and "comparable GSA Schedule 520-11 Accounting Services rates for similar services and like labor categories."  AR Tab 71 at 3565.  The Panel observed that the

---

[2]  The Government's May 10, 2013 Status Report included an addendum to the Administrative Record ("AR Tab 70 at 3547 to Tab 76 at 3618").  5/10/13 Status Report Add., ECF No. 51-1.

[3]  RCFC 15(a)(2) allows a party to amend its pleading with the opposing party's written consent or the court's leave.  RCFC 15(a)(2).  Neither the Government nor MMC has objected to Cohen's filing of the June 7, 2013 Second Amended Complaint, and the court grants Cohen leave to file it.

IGCE offered an imperfect basis for comparison, because: the IGCE reflected inflated costs due to previous labor market conditions; a 5% annual cost of living increase built into the contract on which the IGCE was based; and a work force composed of more "high ranking senior professionals" than required under the Solicitation.  AR Tab 71 at 3565.  The Panel also noted that the IGCE assumed 2080 work hours per staffer per year rather than the 2000 work hours per staffer per year, as specified in the Solicitation, and that the staffing level assumptions upon which the IGCE were based were different than those in the Solicitation.  AR Tab 71 at 3565.  In light of those considerations, the Panel concluded that comparison with the IGCE did not support a finding that any of the prices were unrealistic.  AR Tab 71 at 3565.  In addition, the Panel determined that, with the exception of ████, the offerors' labor rates were "generally comparable to" GSA Schedule 520-11 Accounting Services rates for labor categories that were "as similar as possible to those in the [Solicitation]."  AR Tab 71 at 3565-66 (citing AR Tab 71 at 3568-71 (price realism analysis tables)).  All but one of the GSA Schedule 520-11 Accounting Services rate contracts selected for comparison on remand were different than the rates that the Panel initially used.  *Compare* AR Tab 71 at 3568 (comparing the Solicitation's wage rate categories with those of Martin & Wall, Lionel Henderson & Co., and MacFadden & Associates), *with* AR Tab 29 at 1425-28 (listing wage rates for Lionel Henderson & Co., Grant Thornton, Fuentes Fernandez & Co., and T. Curtis & Co.).  The Panel's price realism analysis of MMC's BAFO showed:

> MMC's labor rates were slightly below the average of the GSA schedule rates considered in four of the six labor categories, and were higher in the remaining categories, but not significantly so. . . . [MMC]'s rates were not the lowest, among all of the offers received, and were only slightly lower than the other BAFO offerors' rates for most categories.

AR Tab 71 at 3566.

Finally, MMC's written offer and oral presentation led the Panel to conclude that MMC "was prepared to meet the contract's requirements in a professional manner" and that MMC therefore satisfied price realism requirements.  AR Tab 71 at 3567.

## IV.   DISCUSSION.

### A.   Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (2006).

The June 7, 2013 post-award bid protest Second Amended Complaint alleges that the November 28, 2012 award to MMC violated FDIC Acquisition Policy Manual ("APM") ¶ 3.210(c) and PGI §§ 3.210(c)(2), 3.214(a)(2), because the FDIC failed to evaluate price realism and document that analysis in a written report. Sec. Am. Compl. ¶¶ 114-26. The June 7, 2013 Second Amended Complaint seeks a permanent injunction requiring the FDIC to set aside the November 28, 2012 award of a business operations support contract to MMC. Sec. Am. Compl. at 25.

Accordingly, 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claim alleged in the June 7, 2013 Second Amended Complaint.

**B.     Standing.**

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the Competition in Contracting Act of 1984, 31 U.S.C. § 3551(2)(A) ("CICA"). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)). A two-part test is applied to determine whether a protester is an "interested party," a protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).

Cohen was one of the three offerors that met the best value requirements of the Solicitation and was selected to make an oral presentation. AR Tab 31 at 1441. In addition, Cohen received the highest technical evaluation of the three offerors asked to submit oral presentations, and Cohen's price was lower than that of the other unsuccessful offeror. AR Tab 31 at 1441. Therefore, Cohen is an "interested party."

A second standing requirement that the protestor must satisfy is that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Prejudice is demonstrated where the protestor "can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. A proper standing inquiry, however, should not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

If, as Cohen asserts, a proper price realism analysis would have led the FDIC to reject MMC's proposal, Cohen would have had a substantial chance of securing the contract. AR Tab 31 at 1441 (showing that Cohen received the highest evaluation of the three offerors asked to submit oral presentations, plus a lower price than the other unsuccessful offeror). Therefore, the court has determined that Cohen has standing to contest the award of the contract at issue in this case.

### C.    Standard Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze the required showings for injunctive relief under APA standards.

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged, based on a regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

If an award decision is challenged as arbitrary, capricious or lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis").

Moreover, the court may set aside a procurement "only in extremely limited circumstances." *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the

bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks and citations omitted).

The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum v. United States*, 404 F.3d 1346, 1353-54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

**D.   Whether The Agency, On Remand, Performed A Rational Price Realism Evaluation Consistent With The Solicitation's Requirements And The Agency's Procedures.**

**1.   The Plaintiff's Argument.**

Cohen argues that the FDIC violated its own procedures, specifically APM ¶ 3.210(c) and PGI § 3.210(c)(2), because the FDIC "failed rationally to analyze offerors' proposed labor rates" to determine whether they were realistic.  6/7/13 Pl. Mot. JAR at 24.  APM ¶ 3.210(c) states, in relevant part:

> Price evaluation is always required to assure the validity and reasonableness of an offeror's price proposal.   Price evaluation includes a determination of reasonableness and realism of the proposed prices. . . . The [Panel] is responsible for determining price realism and documenting its analysis in either the [Panel] Report or a written memorandum to the Contracting Officer.

APM ¶ 3.210(c).

PGI § 3.210(c)(2) states, in relevant part:

The [Panel] evaluates price proposals to determine whether the proposed price for the work is realistic.  A realistic price is one that reflects a clear understanding of the requirement and is consistent with the offeror's technical proposal.  The elements of a price proposal can provide insight into an offeror's understanding of the requirement.  If an offeror's total proposed price either greatly exceeds or falls far short of the Program Office estimate for the requirement, the offeror's understanding of what is required must be questioned.  The [Panel] review and determination includes the appropriateness of:

§   The number and qualifications of personnel to be assigned to the various aspects of the proposed work;
§   Proposed labor rates or proposed material fees; and
§   The price, amount, and necessity of travel.

PGI § 3.210(c)(2).

Cohen asserts that the Panel's price realism analysis is irrational, because the Panel Report Addendum states that MMC's pricing was "generally in line with the other offerors in the competitive range." AR Tab 71 at 3566. In fact, MMC's price was 74% of the next lowest price, submitted by Cohen, and 63% of the average price of the other firms. 6/7/13 Pl. Mot. JAR at 25. The irrationality of the Panel's finding that MMC's pricing was "generally in line with the other offerors in the competitive range" is evident in light of the Panel's inconsistent statement that MMC's pricing was "significantly lower than the IGCE[.]" 6/7/13 Pl. Mot. JAR at 25. The average price of the firms other than MMC was $18.1 million and the IGCE was $16.9 million, so that it is irrational to say that a price of $11.5 million is "generally in line" with an average price of $18.1 million, but "significantly lower than" a price of $16.9 million. 6/7/13 Pl. Mot. JAR at 25-26.

Cohen asserts that the Panel's comparison of MMC's price to three other firms' GSA Schedule rates also is irrational. 6/7/13 Pl. Mot. JAR at 26. Because the FDIC contract requires "rapid scalability in highly-specialized areas," the FDIC should have "expect[ed] rates that were higher than companies' typical rates for general accounting services." 6/7/13 Pl. Mot. JAR at 27. The FDIC's failure to do so meant that it "'entirely failed to consider an important aspect of the problem[.]'" 6/7/13 Pl. Mot. JAR at 27 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Similarly, the FDIC failed to consider the Solicitation's functional specification requirements for each position. 6/7/13 Pl. Mot. JAR at 28 (citing AR Tab 5 at 65 ("A contractor having first met a position's General [labor category requirements] must then meet the additional qualifications that are specific for the position where they will be assigned.")). In addition, the "GSA Schedule consistently ignores the [Solicitation's] detailed and demanding requirements." 6/7/13 Pl. Mot. JAR at 28. Specifically, the FDIC compared the salaries of Project Managers, required by the Solicitation to have ten years of "senior-level managerial/supervisory experience," with the salaries of workers in positions requiring ten years of general professional experience. 6/7/13 Pl. Mot. JAR at 29 (quoting AR Tab 5 at 66 (the Solicitation); citing AR Tab 71 at 3568 (GSA chart); AR Tab 73 at 3589 (Martin & Wall Schedule); AR Tab 74 at 3604 (MacFadden and Associates schedule); AR Tab 75 at 3617 (Lionel Henderson Schedule)). Also, the FDIC compared the salaries of Senior Professionals, required by the Solicitation to have five years of experience within their "functional area," with the salaries of Martin & Wall employees in positions requiring three years of general professional experience. 6/7/13 Pl. Mot. JAR at 18 (citing AR Tab 5 at 68 (the Solicitation); AR Tab 73 at 3588 (Martin & Wall Schedule)). In addition, the FDIC compared the salaries of Technicians, required by the Solicitation to have two years of specialized experience in "financial accounting, financial analysis, accounting operations support or equivalent," with the salaries of Martin & Wall employees in positions requiring one year of general experience. 6/7/13 Pl. Mot. JAR at 18-19 (citing AR Tab 5 at 69 (the Solicitation); AR Tab 73 at 3588 (Martin & Wall Schedule)).

Even if the labor categories were comparable, the comparisons show that MMC's rates are not realistic. 6/7/13 Pl. Mot. JAR at 30. Martin & Wall's rates are consistently higher than MMC's, and MacFadden's rates are higher than MMC's in the two labor categories that account

for 90% of the baseline staffing required under the Solicitation. 6/7/13 Pl. Mot. JAR at 30. Only Lionel Henderson's prices are comparable to MMC's, and Cohen asserts that the GSA's Web site shows that Lionel Henderson "has had virtually no sales under its GSA schedule contract." 6/7/13 Pl. Mot. JAR at 19-20, 30.[4]

Furthermore, Cohen argues that the FDIC's choice of comparators is irrational, as shown by Cohen's analysis of the "Senior Professional equivalent rate" charged by fourteen firms that the FDIC invited to make offers under the Solicitation. 6/7/13 Pl. Mot. JAR at 31. The FDIC selected only one of those firms as a comparator, and that firm, "Lionel Henderson[,] is an extreme outlier." 6/7/13 Pl. Mot. JAR at 31. ███████ "Senior Professional equivalent rate" is only ██████; the next lowest rate among invitee firms is $85.43, and all of the other firms' rates were more than $100. 6/7/13 Pl. Mot. JAR at 31. If the FDIC had selected any other invitee as a comparator, instead of Lionel Henderson and "two other firms it did not deem relevant enough to include in its bid invitation . . . its GSA Schedule analysis would have plainly showed that MMC's senior professional rate was unrealistic." 6/7/13 Pl. Mot. JAR at 31.

Cohen also objects to the Panel's conclusion that MMC's strong technical scores demonstrated MMC's understanding of the Solicitation's pricing requirements. 6/7/13 Pl. Mot. JAR at 33. This conclusion is irrational, because "[n]owhere does MMC's technical proposal identify any unique approach that would allow it to hire individuals meeting the [Solicitation's] demanding qualification requirements at rock bottom rates." 6/7/13 Pl. Mot. JAR at 33. The FDIC's reliance on MMC's technical scores "renders superfluous the PGI's requirement for a separate, price-based analysis." 6/7/13 Pl. Mot. JAR at 34.

Finally, Cohen objects to the Panel's "irrational" assertion that the fixed-price nature of the contract puts the financial risk associated with a low bid on MMC. 6/7/13 Pl. Mot. JAR at 34 (citing AR Tab 71 at 3567). Price realism analysis always involves fixed-price contracts and is intended to protect the agency from "the risk of degraded performance that may result if an offeror submits an unrealistically low price in order to win a fixed-price procurement, but then must 'cut corners' to avoid a loss on the contract." 6/7/13 Pl. Mot. JAR at 35.

### 2.    The Government's Response.

The Government responds that FDIC's remand price realism analysis "should be upheld because it is consistent with the [Solicitation's] terms and the FDIC's procurement rules and takes into account information that is relevant to a price realism analysis." 7/1/13 Gov't Mot. JAR at 13. "Cohen identifies no law or regulation that the FDIC's price realism analysis violated." 7/1/13 Gov't Mot. JAR at 14. Because neither the PGI nor the Solicitation describe a particular methodology for conducting price realism analysis, the FDIC has broad discretion in conducting its analysis. 7/1/13 Gov't Mot. JAR at 15. Furthermore, the court is not at liberty to introduce price realism analysis requirements not in the FDIC's regulations or in the Solicitation.

---

[4] Cohen's June 6, 2013 Motion For Judgment On The Administrative Record introduces evidence that is not part of the Administrative Record, and although Cohen says the information is from the GSA's Web site there is no citation to the Uniform Resource Locator address for the page on which the data may be found. 6/7/13 Pl. Mot. JAR at 19-20.

7/1/13 Gov't Mot. JAR at 16 (citing *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375-76 (Fed. Cir. 2009) ("The trial court's duty was to determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP . . . not to introduce new requirements outside the scope of the RFP.")).

In addition, the FDIC compared MMC's labor rates to those of the other offerors and rationally concluded that MMC's rates were realistic, because they "were not the lowest, among all of the offers received, and were only slightly lower than the other BAFO offerors' rates for most categories."  7/1/13 Gov't Mot. JAR at 18 (quoting AR Tab 71 at 3566).  The Panel's "judgment that MMC's 'proposed labor rates were not significantly lower than other offerors' proposed rates' . . . was well within the FDIC's discretion."  7/1/13 Gov't Mot. JAR at 19 (quoting AR Tab 71 at 3566).  Cohen incorrectly focuses on overall price, as the FDIC looked at the rates for each labor category.  7/1/13 Gov't Mot. JAR at 19.  For this reason, and because the Panel concluded that the IGCE relied on different assumptions than the Solicitation, it was not irrational for the Panel to determine that a price was significantly below the IGCE, but "in line" with other offerors' labor rates.  7/1/13 Gov't Mot. JAR at 19-20.  As such, the Panel's analysis of labor rates by category revealed that for each category "the lowest rate offered by another bidder was generally lower than or only marginally higher than MMC's."  7/1/13 Gov't Mot. JAR at 20 (citing AR Tab 71 at 3566, 3571).

The Panel's choice of GSA Schedule comparators also was rationally based on its determination that Martin & Wall, Lionel Henderson, and MacFadden & Associates had "labor categories that were as similar as possible" to the Solicitation's.  7/1/13 Gov't Mot. JAR at 20-21 (quoting AR Tab 71 at 3565).  MMC's rates were not the lowest in five out of the six labor categories, but its ████ rate was lowest, and within ████ of Martin & Wall's and Lionel Henderson's rates.  7/1/13 Gov't Mot. JAR at 21.  The Panel, therefore, rationally concluded that the GSA Schedule comparison showed that MMC's pricing was realistic.  7/1/13 Gov't Mot. JAR at 21.

Cohen's arguments that the Panel should have based its labor rate comparisons on functional specialties as well as labor categories is misplaced, because the Solicitation calls for the price realism analysis to be based solely on labor categories.  7/1/13 Gov't Mot. JAR at 22 (citing AR Tab 5 at 150 ("Labor rates that do not reflect a reasonable compensation for the skill required in a labor category will be considered unrealistic.")); 7/16/13 Gov't Reply at 6 ("'The [price] will be computed based on the total of the following: (a) the offeror's proposed labor rates for each labor category multiplied by the number of labor hours.'" (quoting AR Tab 5 at 150 (the Solicitation))).  Since the FDIC made it clear that labor rates applied to experience levels, not functional specialties, it was rational for the Panel's price realism analysis to be based on experience levels rather than functional specialties.  7/1/13 Gov't Mot. JAR at 23 (citing AR Tab 10 at 830 (July 30, 2012 Questions and Answers on the Solicitation, stating that "bids should indicate a single rate for each experience level.").  Also, "Cohen previously argued that comparisons to GSA schedules (which contain rates for general labor categories, not specific positions) were a necessary component of any price realism analysis."  7/1/13 Gov't Mot. JAR at 22 (citing Compl. ¶¶ 82-84).  But, Cohen distorted the Panel's words when it misstated that the Panel Report Addendum read that during a "period when the number of bank closings [i]s high, it [i]s necessary to pay relatively high rates in order to attract experienced professionals."  7/1/13

Gov't Mot. JAR at 23 (quoting 6/7/13 Pl. Mot. JAR at 27).  In fact, the Panel Report Addendum was referring to the high price of the incumbent contract when it said that "when the number of bank closings *was* high, it *was* necessary to pay relatively high rates in order to attract experienced professionals."  AR 71 at 3565 (emphasis added).  Therefore, rather than forecasting a heightened number of bank closings, the Panel was contrasting the conditions that led to higher costs under the incumbent contract with the conditions that led to the possibility of lower costs under the contract being solicited.  7/1/13 Gov't Mot. JAR at 23.  "Without any record support, Cohen assumes that it was the FDIC's plan to guard against its prior [2008 financial crisis] problems by paying crisis labor rates in perpetuity simply because another crisis could arise."  7/16/13 Gov't Reply at 4.

Cohen also is mistaken when it argues that five of the GSA Schedule's position descriptions were not "equivalent" to the Solicitation's position descriptions.  7/1/13 Gov't Mot. JAR at 24.  The Panel was acting well within its discretion when it compared offerors' labor rates with labor rates for positions that were "as similar as possible."  7/1/13 Gov't Mot. JAR at 24 (quoting AR Tab 71 at 3565).  In addition, although Cohen focuses on differences that would make the comparators' labor rates lower than those for the contract awarded under the Solicitation, there are other differences that would make their labor rates higher.  7/1/13 Gov't Mot. JAR at 26; *compare* AR Tab 73 at 3588-89 (showing that Martin & Wall's Senior Manager job description included "usually a CPA in good standing"), *with* AR Tab 71 at 3568 (showing no such qualification description for a Project Manager under the Solicitation)); *compare* AR Tab 73 at 3588 (showing that Martin & Wall's Senior Consultant job description required "an advanced degree in a related field and/or a professional license), *with* AR Tab 71 at 3568 (showing no such qualification requirement for a Senior Professional under the Solicitation); *compare* AR Tab 75 at 3614 (showing that Lionel Henderson's Accountant III position required management experience), *with* AR Tab 71 at 2568 (showing no such qualification requirement for a Senior Professional under the Solicitation); *compare* AR Tab 74 at 3604 (showing that MacFadden's Senior Accountant job description required eight years of experience or equivalent combination of education and experience), *with* AR Tab 71 at 3568 (showing a Senior Professional under the Solicitation required only five years of experience).  "It was within the [Panel's] discretion to reach the conclusion that all differences considered, these GSA schedules were sufficiently similar to the [Solicitation] categories that they could help inform the [Panel's] realism analysis."  7/1/13 Gov't Mot. JAR at 26.

The FDIC also acted rationally when its price realism analysis took into account the strengths of MMC's technical proposal.  7/1/13 Gov't Mot. at 29.  Those technical strengths reflected MMC's understanding of what the Solicitation required and therefore were relevant to the price realism inquiry.  7/1/13 Gov't Mot. JAR at 29 (citing PGI § 3.210(c) ("If an offeror's total proposed price either greatly exceeds or falls far short of the Program Office estimate for the requirement, the offeror's understanding of what is required must be questioned.")).  Even though the FDIC did not find that MMC's price fell "far short" of the IGCE, the review of MMC's understanding of the Solicitation was an appropriate part of price realism analysis.  7/1/13 Gov't Mot. JAR at 29.

In addition, the FDIC acted rationally when it observed that MMC bore the financial risk of an underpriced proposal.  7/1/13 Gov't Mot. JAR at 32.  This is an important consideration

underlying the Federal Acquisition Regulation's requirement that price realism be analyzed in all cases for cost-reimbursement contracts, but only in exceptional cases for fixed-price contracts. 7/1/13 Gov't Mot. JAR at 32 (citing 48 C.F.R. § 15.404-1(d)); *see also Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 303 (2011) ("In a fixed-price procurement, the agency ordinarily does not consider the 'realism' of offerors' proposed prices because the contractor bears the risk of underpricing its offer.").

### 3.      The Defendant-Intervenor's Response.

MMC adds that Cohen has failed to demonstrate that the FDIC's price realism analysis contained any objective errors. 7/16/13 Int. Reply at 2. "[T]he mere fact that MMC's labor rates are lower than [Cohen's] or other offerors' rates does not make them unrealistic." 7/16/13 Int. Reply at 3. Although Cohen argues that "[t]he FDIC should have recognized that the need for rapid scalability in highly-specialized areas was a reason to expect rates that were higher than companies' typical rates for general accounting services," there is no record evidence that Cohen or any other offeror proposed rates significantly higher than their typical rates. 7/16/13 Int. Reply at 4-5 (quoting 6/7/13 Pl. Mot. JAR at 27). In fact, Cohen's proposed rates were lower than the ones it charged on the incumbent contract. 7/16/13 Int. Reply at 5 (citing Pl. Mot. JAR at 14). Furthermore, the Solicitation belies Cohen's assertion that the Solicitation was for "a disaster preparedness contract." 7/16/13 Int. Reply at 5 (quoting 7/9/13 Pl. Resp. at 4; citing AR Tab 1 at 6 (FDIC Memorandum, forecasting bank receiverships to increase from 480 in 2012 to 487 in 2018, with a peak of 491 in 2016)).

The Panel's conclusion that MMC's pricing was both "significantly lower than the IGCE" and "generally in line with the other offers in the competitive range" was not irrational, because the comparison to the IGCE was based on total price, while the comparison to the other offers in the competitive range was based on "proposed base year labor rates." 7/1/13 Int. Mot. JAR at 14 (citing AR Tab 71 at 3566-67, 3571). Furthermore, the "slight differences" Cohen notes between the GSA Schedule comparators and the Solicitation labor categories "are not material in the context of the [Panel's] express recognition that the sample categories it used for comparison purposes were 'as similar as possible' to the Solicitation's labor categories[.]" 7/1/13 Int. Mot. JAR at 16. Also, the Solicitation clearly stated the FDIC's intent to evaluate the realism of offerors' labor rates based on labor categories, not functional areas, and Cohen was obligated to file any protest of that choice before it submitted its proposal. 7/1/13 Int. Mot. JAR at 18 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the [United States] Court of Federal Claims.")).

MMC has more than twenty years of experience, including direct experience with the FDIC, that evidence that MMC "knows the market and what it takes to staff contracts like this one, so there was no risk to the FDIC from awarding a contract to MMC [at] the firm-fixed rates that MMC proposed[.]" 7/16/13 Int. Reply at 8 (citing AR Tab 71 (Panel Report noting MMC's experience)). Also, because a "realistic price is one that reflects a clear understanding of the requirement and is consistent with the offeror's technical proposal" (PGI 3.210(c)(2)), the Panel

acted rationally when it concluded that the strength of MMC's technical proposal evidenced that the cost savings that MMC offered the FDIC would not impair satisfactory performance of the contract. 7/1/13 Int. Mot. JAR at 21.

### 4.   The Court's Resolution.

MMC offered the FDIC a ████ cost savings over Cohen's offer, the next lowest priced BAFO among the four offerors within the competitive range. AR Tab 71 at 3567. A low price, however, is not necessarily an unrealistic one. *See* PGI § 3.210(c)(2) (stating that even a very low price only requires the FDIC to "question[]" an "offeror's understanding of what is required" but not necessarily reject the offer); *see also CTA Inc. v. United States*, 44 Fed. Cl. 684, 693–94 (1999) (determining that a proposed labor rate that was fifty-three percent lower than the incumbent contract rate was not unrealistic). In this case, the FDIC took a belt-and-suspenders approach to its price realism analysis on remand: first, it determined that MMC's price was not low enough to trigger skepticism about the price's realism; and second, it determined that MMC's offer provided sufficient evidence that MMC understood what the Solicitation required. AR Tab 71 at 3566-67.

As the court noted in its March 27, 2013 Memorandum Opinion And Order, the proposals' prices were based on different assumptions than the IGCE, against which they were to be compared. *Cohen*, 110 Fed. Cl. at 288 n.8 (explaining the many differences between the assumptions under which the IGCE was calculated and the requirements for proposals under the Solicitation). The Panel thus acted reasonably when it determined that its comparison of the proposals' prices with the IGCE did not support a conclusion that any of the prices were unrealistic. AR Tab 71 at 3565; *see also* PGI § 3.210(c)(2) (requiring that the FDIC make the comparison).

Nonetheless, the FDIC's regulations state that an offeror's understanding of the Solicitation's requirements "must be questioned" if that "offeror's total proposed price . . . falls far short of the Program Office estimate." PGI § 3.210(c)(2). Assuming, *arguendo*, that Cohen is correct in arguing that MMC's $11.5 million price fell "far short" of the $16.9 million IGCE, the FDIC was obligated to investigate further, and it did. As required by FDIC regulations, the Panel investigated "the appropriateness of . . . [p]roposed labor rates." PGI § 3.210(c)(2); AR Tab 71 at 3568-71. In addition, the Panel reviewed both the written and oral aspects of MMC's proposal and found evidence that MMC did, in fact, understand the Solicitation's requirements. AR Tab 71 at 3566-67 (describing the Panel's "close review of [MMC's] strengths and weaknesses" leading to a determination that "MMC was prepared to meet the contract's requirements in a professional manner"). Cohen's challenges to the Panel's methodology fail, because the Solicitation and the FDIC regulations gave the Panel broad discretion in conducting price realism analysis, and the court applies a highly deferential standard of review in bid protest cases. *See Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . ."); *Ala. Aircraft Indus.*, 586 F.3d at 1375-76 (reversing the trial court's upholding of a bid protest where the agency complied with the requirements of the solicitation and regulations). In short, the FDIC met its obligations under the Solicitation and PGI § 3.210(c)(2).

For these reasons, the court has determined that the FDIC, on remand, performed a rational price realism evaluation consistent with the Solicitation's requirements and the FDIC's procedures.

**V.      CONCLUSION.**

For these reasons, the Government's July 1, 2013 Motion For Judgment On The Administrative Record is granted; MMC's July 1, 2013 Motion For Judgment On The Administrative Record is granted; Cohen's June 7, 2013 Motion For Judgment On The Administrative Record is denied; and the March 27, 2013 preliminary injunction is dissolved. The Clerk is instructed to enter judgment for the Government and MMC.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**